# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ROBERT LEIMKUEHLER, as Trustee of and on behalf of LEIMKUEHLER, INC. PROFIT SHARING PLAN, and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 1:10-cv-333-JMS-TAB |
| vs. | ) ) | |
| AMERICAN UNITED LIFE INSURANCE CO., | ) ) | |
| Defendant. | ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Robert L. King
KOREIN TILLERY LLC
505 N. 7th Street, Suite 3600
St. Louis, Missouri 63101
Phone:  (314) 241-4844
Fax:  (314) 241-3525

Kathleen A. DeLaney
Edward O. DeLaney
Amanda Couture
DELANEY & DELANEY LLC
3646 N. Washington Blvd.
Indianapolis, IN  46205
Phone: (317) 920-0400
Fax: (317) 920-0404

Klint L. Bruno
KOREIN TILLERY LLC
205 N. Michigan Avenue, Suite 1940
Chicago, Illinois 60601
Direct: (312) 899-5065
Fax: (312) 641-9555

Eric H. Zagrans
ZAGRANS LAW FIRM LLC
474 Overbrook Road
Elyria, Ohio 44035
Phone: (440) 452-7100

*Attorneys for the Trustee of Leimkuehler, Inc. Profit Sharing Plan*

TABLE OF CONTENTS

Introduction ................................................................................................................. 1

Statement of Material Facts in Dispute ....................................................................... 2

I.   AUL selects and limits the universe of funds and selects mutual fund share classes. .............. 2

II.  AUL holds plan assets in its separate account. ...................................................... 4

III. AUL received revenue sharing payments from mutual funds. ................................. 6

IV.  AUL did not disclose its receipt of revenue sharing to the Trustee or credit them
     properly to the Plan. ............................................................................................ 7

Argument .................................................................................................................... 9

I.   Genuine issues of material fact preclude a finding that AUL exercises no control over
     management or disposition of the Plan's assets. ................................................... 9

     A.   The Exercise of *Any* Authority or Control Over Management or Disposition of
          Plan Assets Creates Fiduciary Status. .......................................................... 11

     B.   AUL's Exercise of Authority or Control over the Disposition of the Plan's Assets
          Precludes Entry of Summary Judgment for AUL. ........................................ 14

     C.   AUL's Exercise of Authority or Control over the Management (or Disposition) of
          the Plan's Assets Precludes Entry of Summary Judgment for AUL. .............. 17

          1.   AUL established, owns and controls the separate account and its "investment
               accounts," and AUL determines the value of investment account accumulation
               units. ..................................................................................................... 18

          2.   AUL selects and limits the investment options available to the Plan. .............. 20

               a.   AUL selects and limits the mutual funds in which the Plan's assets may be
                    invested. ......................................................................................... 20

               b.   AUL unilaterally selects the share classes of the mutual funds in which the
                    Plan's assets may be invested. ......................................................... 26

II.  AUL's Provision of "Investment Advice" Precludes Summary Judgment on
     Fiduciary Status. ................................................................................................ 27

III. AUL's Discretionary Authority or Responsibility Precludes Summary Judgment on
     Fiduciary Status. ................................................................................................ 31

IV.  ERISA's "to the extent" limitation on fiduciary status does not defeat the Trustee's claims.................................................................................................................... 32

Conclusion ...................................................................................................................... 35

TABLE OF AUTHORITIES

**CASES**

*Brandt v. Grounds*, 687 F.2d 895 (7th Cir. 1982)........................................................... 33

*Briscoe v. Fine*, 444 F.3d 478 (6th Cir. 2006) .................................................... 13, 15, 16

*Central States Pension Fund v. Central Transp., Inc.,* 472 U.S. 559 (1985) ................................ 9

*Chao v. Day*, 436 F.3d 234 (D.C. Cir. 2006)............................................ 11, 13, 14, 15

*Coldesina v. Estate of Simper*, 407 F.3d 1126 (10th Cir. 2005)................................ 12, 13, 15, 16

*Commissioner v. Keystone Consol. Indus., Inc.,* 508 U.S. 152 (1993)........................................ 34

*Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410 (4th Cir. 1993) ........................................ 11

*F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250 (2d Cir. 1987)...................... 25

*Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101 (1989)............................................ 9, 10

*FirsTier Bank, N.A. v. Zeller*, 16 F.3d 907 (8th Cir. 1994) ............................................ 11

*Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000)...................... 10

*Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009)........................................ 23, 24

*Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432 (1999) ................................................ 10

*In re Bucci*, 493 F.3d 635 (6th Cir. 2007)........................................................ 11

*IT Corp. v. General Am. Life Ins. Co.*, 107 F.3d 1415 (9th Cir. 1997)........................ 3, 12

*Johnson v. Georgia-Pac. Corp.*, 19 F.3d 1184 (7th Cir. 1994) ...................................... 11

*Keach v. U.S. Trust Co.*, 419 F.3d 626 (7th Cir. 2005) .............................................. 34

*Langbecker v. Electronic Data Sys. Corp.*, 476 F.3d 299, (5th Cir. 2007)........................ 21

*Leigh v. Engle*, 727 F.2d 113 (7th Cir. 1984) .................................................... 34

*Lockheed Corp. v. Spink*, 517 U.S. 882 (1996)...................................................... 2

*LoPresti v. Terwilliger*, 126 F.3d 34 (2d Cir. 1997)................................................ 12

*Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209 (2d Cir. 1987)................................ 35

*Massachusetts v. Morash*, 490 U.S. 107 (1989) ............................................................. 9

*Mertens v. Hewitt Assoc.*, 508 U.S. 248 (1993) (White, J., dissenting)................................... 9, 11

*Midwest Cmty. Health Serv., Inc. v. American United Life Ins. Co.*, 255 F.3d 374
  (7th Cir. 2001).......................................................................................................... 32

*Pegram v. Herdrich*, 530 U.S. 211 (2000)........................................................... 10, 32, 33

*Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987) ........................................................ 10

*Premier Elec. Const. Co. v. National Elec. Contractors Ass'n, Inc.*, 814 F.2d 358
  (7th Cir. 1987)........................................................................................................... 17

*Roberts v. American Airlines, Inc.*, 526 F.2d 757 (7th Cir. 1975).................................... 17

*Rud v. Liberty Life Assur. Co. of Boston*, 438 F.3d 772 (7th Cir. 2006) ...................... 31

*Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983)............................................................ 9

*Smith v. Provident Bank*, 170 F.3d 609 (6th Cir. 1999)............................................. passim

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ............................................. 13

## STATUTES

29 U.S.C. § 1002(17) ....................................................................................................... 19

29 U.S.C. § 1002(9) ......................................................................................................... 11

29 U.S.C. § 1110(a) ............................................................................................................ 3

29 U.S.C. § 1002(21)(A)............................................................................................. passim

29 U.S.C. § 1106(b)(3) .................................................................................................... 36

## REGULATIONS

29 C.F.R. § 2510.3–102(a)(1)......................................................................................... 14

29 C.F.R. § 2510.3-21(c)(1)............................................................................................ 28

29 CFR § 2510.3-101(h)(1)(iii) ...................................................................................... 16

Final Regulation Regarding Participant Directed Individual Account Plans
  (ERISA Section 404(c) Plans), 57 FR 46906-01 ..................................................... 21

## <u>OTHER AUTHORITIES</u>

H.R. Rep. No. 93-533 (1973) ........................................................................................... 9

**INTRODUCTION**

AUL denies that it is an ERISA fiduciary of the Leimkuehler Plan on the grounds that it exercises no authority or control over the Plan's assets, yet AUL admits "it invests [those assets] in mutual funds." Dkt. 129 at 8. Unlike plan management or administration, which require "discretionary" authority or control, any exercise of authority or control over a plan's assets is sufficient to render a person an ERISA fiduciary. Trust law imposes a high standard of care upon those who handle money or other assets on behalf of another, because one who controls another's assets is in a position to misuse those assets. Adopting that standard in ERISA, Congress has imposed fiduciary obligations on anyone who "exercises *any* authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i) (emphasis added).

AUL's admission that it receives plan assets into AUL's separate account and then invests them establishes beyond dispute that AUL "exercises any authority or control" over the Plan's assets. Indeed, after the Plan sends participants' contributions to AUL, AUL has exclusive control of those plan assets. This exercise of control over the Plan's assets renders AUL a fiduciary of the Plan.

In addition, AUL is wrong about its repeated assertion that the Trustee must show AUL "was acting as a fiduciary when it received 'revenue sharing' payments from mutual fund companies." Dkt. 129 at 5. First, although the Trustee must show that AUL was acting as a fiduciary when taking the action giving rise to his claim, the Trustee's claim is not that AUL engages in revenue sharing, but rather that AUL does not disclose revenue sharing and does not give the Plan a dollar-for-dollar credit for the revenue sharing payments AUL receives. When AUL functioned as a fiduciary of the Plan, it did not disclose revenue sharing or properly credit the Plan for

1

revenue sharing. Thus, there is no disconnect between AUL's fiduciary status and the breach of fiduciary duty alleged by the Trustee.

Second, unlike a breach of fiduciary duty claim, a section 406(b)(3) "prohibited transaction" does not require proof the defendant was acting as a fiduciary when taking the action from which the claim arose. Section 406(b)(3) prohibits a form of self-dealing and applies "to bar categorically" certain transactions by anyone whose functions include fiduciary functions. *Lockheed Corp. v. Spink*, 517 U.S. 882, 888 (1996). For these and additional reasons discussed below, AUL's motion for summary judgment should be denied.

## STATEMENT OF MATERIAL FACTS IN DISPUTE

### I.   AUL SELECTS AND LIMITS THE UNIVERSE OF FUNDS AND SELECTS MUTUAL FUND SHARE CLASSES.

AUL created and maintains a list of mutual funds into which its 401(k) plans' assets may be invested.  Kingsley Tr. 100:6–8, 140:25 to 141:1 (Dkt. 134-1); Burns Tr. 29:13 to 31:3, 32:14 to 33:1, 39:15–18, 40:14–18 (Dkt. 134-2). As of August 2010, there were 383 mutual funds on that list.[1] Dkt. 128-18 at 8, 15–23. AUL decides which funds will be on the list. Kingsley Tr. 100:6–8, 140:25 to 141:1 (Dkt. 134-1); Burns Tr. 33:22 to 34:11 (Dkt. 134-2). Before a fund is added to the list, AUL screens it using many factors, such as past performance and portfolio theory. Burns Tr. 23:17–23 (Dkt. 134-2). Funds already on the list are periodically scored as part of a "due diligence report." *Id*. at 19:3–20; Welsh Tr. 41:4–19 (Dkt. 134-3). The mutual funds on the list are the only mutual funds in which AUL's 401(k) plans may have their assets invested. Kingsley Tr. 100:6–8, 140:25 to 141:1 (Dkt. 134-1); Yoerger Tr. 42:21 to 43:15 (Dkt. 134-4); Burns Tr. 89:3–15 (Dkt. 134-2). If a mutual fund is not on the list, a plan sponsor or trustee cannot include

---

[1] What AUL now maintains as one list of investment options was multiple lists:  Dimensions Investment Option List (Dkt. 134-7); AULternatives/Dimensions Investment Option List (Dkt. 134-8); Foundation Investment Option (Dkt. 134-9); Architect Investment Option List (Dkt. 134-10).

it in its plan's menu of investment options. Jackson Tr. 82:21–24 (Dkt. 135-1); Wright Tr. 59:11

to 60:3 (135-2). AUL has the final say over which mutual funds are on its list. Burns Tr. 33:22 to

34:11, 37:5–11 (Dkt. 134-2). Thus, for instance, in the Leimkuehler Plan's July 2000 group

annuity contract,[2] AUL limited the Trustee's selection of investment options to the universe of

34 funds AUL made available to the Plan at that time. Leimkuehler Group Annuity Contract

(hereinafter "GAC") (Dkt. 128-11 at 17).

In addition to deciding which mutual funds to make available to plans, AUL also selects the

share classes of those mutual funds. Jackson Tr. 82:21–22 (Dkt. 135-1); Welsh Tr. 31:10–15

(Dkt. 134-3); Burns Tr. 203:6–11 (Dkt. 134-2). Each mutual fund has multiple available share

classes. Welsh Tr. 57:10 to 58:1 (Dkt. 134-3). For example, Growth Fund of America has five

share classes:  R-1, R-2, R-3, R-4 and R-5. Burns Tr. 115:1–16 (Dkt. 134-2). The difference be-

tween share classes is the amount of their expense ratios. Burns Tr. 30:18 to 31:3, 222:16–20

(Dkt. 134-2); Kasten Report ¶ 13 (Dkt. 89 at 8). An expense ratio is the amount a mutual fund

charges for its services, expressed as a percentage of the total assets the fund has under manage-

ment. *See infra* at 26 n.21. The amount of that charge (*i.e.*, the percentage) varies from share

class to share class. Burns Tr. 30:18 to 31:3 (Dkt. 134-2); Wright Tr. 76:15–20 (Dkt. 135-2).

AUL did not disclose to plans which share classes AUL selected for the plans. Burns Tr. 220:15

to 221:22 (Dkt. 134-2); Jackson Tr. 82:6–24 (Dkt. 135-1). AUL never disclosed to the Trustee

---

[2] AUL attempts to disclaim fiduciary status in its group annuity contract, which states that "AUL is not a
fiduciary under this contract or under any such Plan, trust, custodial agreement, or other agreement." Dkt.
128-11 at 26 § 2.1. ERISA provides that "any provision in an agreement or instrument which purports to
relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part
shall be void as against public policy." 29 U.S.C. § 1110(a); *see IT Corp. v. General Am. Life Ins. Co.*,
107 F.3d 1415, 1418 (9th Cir. 1997) ("If an ERISA fiduciary writes words in an instrument exonerating
itself of fiduciary responsibility, the words, even if agreed upon, are generally without effect."). AUL has
conceded this point in its class certification memorandum. Dkt. 125 at 31 ("True, ERISA generally pre-
vents fiduciaries from disclaiming liability, but the relevant statutory section says nothing about whether a
person is a fiduciary in the first place. More to the point, AUL is not claiming that the cited contractual
provision is dispositive on the question of fiduciary status; it isn't.").

the share classes into which AUL invested the Leimkuehler Plan's assets. Burns Tr. 220:15 to 221:22 (Dkt. 134-2); Yoerger 54:18–24 (Dkt. 134-4); *see also* Dkt. 128-11 at 17, 48 (no disclosure in table of investment accounts).

## II.   AUL HOLDS PLAN ASSETS IN ITS SEPARATE ACCOUNT.

From the perspective of the participants in AUL's 401(k) plans, participants invest their retirement contributions directly in mutual funds:  "from a participant standpoint, an employee standpoint, ... [t]hey're just having money withheld, and we're taking that money and then investing it with [a mutual fund like] Janus. But legally I suppose it's fully going through a separate account." Welsh Tr. 39:18 to 40:6 (Dkt. 134-3). The investment transaction is actually a two-step process. *Id*. at 39:1–17 (Dkt. 134-3). First, participants' contributions go into AUL's "separate account," where they are commingled with the contributions of thousands of other participants. *Id.* at 40:7–25 (Dkt. 134-3). Second, AUL uses those assets to purchase mutual fund shares. *Id*. at 39:6 to 40:14 (Dkt. 134-3).

AUL owns an insurance company separate account that it refers to as "our[3] Series Separate Account II." GAC (Dkt. 128-11 at 4, §1.15); *see also id.* at 40 § 9.1 ("All amounts received or credited under this contract become the property of AUL."); *id.* at 15 § 9.16 ("We own all Mutual Fund or Portfolio shares held in an Investment Account."). AUL divides the separate account into "investment accounts," each of which corresponds to a specific mutual fund (into which AUL invests the assets in the second step). Tatum Tr. 31:22 to 32:10 (Dkt. 134-5). AUL typically gives its investment accounts names that are the same as the mutual fund associated with that investment account. GAC (Dkt. 128-11 at 17).  For example, the "Alger American

---

[3] "When used in this contract, 'we,' 'us,' or 'our' refer to AUL and 'you' or 'your' refer to the Contractholder." GAC (Dkt. 128-11 at 3). The "Contractholder" is a plan's trustee or other named fiduciary who enters into the contract on the plan's behalf. The Contractholders in the specific contract cited here, for example, are the Trustees of the 401K Advantage, LLC 401(k) Plan. *Id*.

Growth" investment account invests in the mutual fund known as "Alger American Growth." GAC (Dkt. 128-11 at 17) (table of investment accounts).

AUL's investment accounts are further subdivided or "unitized" into "accumulation units." GAC (Dkt. 128-11 at 22 §1.3); Yoerger Tr. 112:7–12 (Dkt. 134-4). In its group annuity contracts, AUL defines an "accumulation unit" as "a valuation device used to measure increases in and decreases to the value of any 'Investment Account.'" GAC (Dkt. 128-11 at 22 §1.3). Thus, when a participant makes contributions to his 401(k) plan, he is purchasing accumulation units of an investment account (within AUL's separate account), not mutual fund shares. Yoerger Tr. at 114:4–8 (Dkt. 134-4); Burns Tr. at 71:9–22 (Dkt. 134-2); Welsh Tr. at 38:10–15 (Dkt. 143-3) ("we don't market it as an investment in the actual mutual fund"; AUL markets it "as an investment in a separate account which then invests in the underlying mutual fund"). When AUL receives 401(k) contributions, it commingles the contributions from all of its plans in the separate account and allocates them to the investment accounts the participants have selected. Tatum Tr. at 33:3–19 (Dkt. 134-5); Yoerger Tr. at 112:3–12 (Dkt. 134-4); Welsh Tr. at 50:24 to 51:1 (Dkt. 134-3) ("participant funds are pooled in that separate account").

AUL calculates the daily value of accumulation units based on a formula AUL created. Yoerger Tr. 114:4–21 (Dkt. 134-4). AUL also assesses a fee on assets in the separate account. Kingsley Tr. 32:23 to 33:5 (Dkt. 134-1). The value of accumulation units are based on the value of the underlying mutual fund shares and the fees AUL assesses in the separate account. Tatum Tr. 42:15–24 (Dkt. 134-5).

As noted, after it runs participants' contributions through its separate account, AUL then invests those commingled contributions from each investment account in the particular mutual fund that AUL associates with that investment account. GAC (Dkt. 128-11) at 4 § 1.15

5

("Amounts allocated to any Investment Account are invested in the share of the corresponding Mutual Fund ...."); Welsh Tr. 39:6 to 40:14 (Dkt. 134-3); Yoerger Tr. 114:4–8 (Dkt. 134-4); Burns Tr. 71:13–22 (Dkt 134-2).

## III. AUL RECEIVED REVENUE SHARING PAYMENTS FROM MUTUAL FUNDS.

AUL requires the mutual funds on its list to enter into revenue sharing agreements — or as AUL calls them, "participation agreements" — before they can participate in AUL's 401(k) program.[4] Burns Tr. 82:2–8, 103:22 to 104:10 (Dkt. 134-2); *see also* Kasten Report (Dkt. 89 at 3) ("revenue sharing payments can provide an incentive for the 401(k) service provider to sell the shares of that mutual fund because they provide revenue to the service provider"). AUL's Vice President of Product and Marketing Strategies testified that "they are paying us to include them in a product suite that would allow them to gather assets." Welsh Tr. 73:16–18 (Dkt. 134-3).

Under the terms of these revenue sharing agreements, a mutual fund agrees to share a portion of its expense ratio with AUL, (Burns Tr 85:5–11 (Dkt. 134-2); American Funds Participation Agreement (Dkt. 134-11); *see also* Kasten Report ¶ 9 (Dkt. 89 at 4)), thereby effectively agreeing to provide its services for a reduced fee. Kasten Report (Dkt. 89 at 6) ("the mutual fund is in reality agreeing to take a reduced fee for its services"). Share classes with higher expense ratios pay more revenue sharing to AUL than share classes with lower expense ratios. Kasten Report (Dkt. 89 at 7). *Cf.* American Funds Participation Agreement (Dkt. 134-11) *with* American Funds expense ratios (Dkt. 135-4). In other words, the more expensive the share class AUL selects to invest plan assets, the more money the mutual fund pays AUL in revenue sharing. As an example, AUL's agreement with American Funds allows AUL to invest plan assets into five different share classes of the Growth Fund of America, but AUL only selects the R-3 or R-4

---

[4] AUL does offer investments in some Vanguard funds, but Vanguard does not pay revenue sharing to 401(k) providers. Burns Tr. 80:5-12 (Dkt. 134-2).

share classes, both of which pay revenue sharing. American Funds Participation Agreement (Dkt. 134-11); Burns Tr. 29:24 to 30:2, 30:18 to 31:3 (Dkt. 134-2). AUL *never* uses the American Fund share classes that pay the least revenue sharing. Burns Tr. 29:21 to 30:6, 119:19–23 (Dkt. 134-2).

## IV.  AUL DID NOT DISCLOSE ITS RECEIPT OF REVENUE SHARING TO THE TRUSTEE OR CREDIT THEM PROPERLY TO THE PLAN.

Until 2007, AUL made no pretense of disclosing the existence of revenue sharing to any of its plans. Prior to 2007, AUL never provided anyone — its agents, plan trustees or participants — any kind of disclosure about the revenue sharing in its 401(k) plans. Burns Tr. 203:14 to 208:23 (Dkt. 134-2). In fact, before 2007 AUL concealed revenue sharing information as a conscious policy decision. For example, in a January 2005 e-mail exchange, AUL's Vice President of Operations and Actuary, Retirement Services, Andy Wilkinson, expressed "significant reservations about disclosing revenue sharing."

> While I still have significant reservations about disclosing revenue sharing, I have less of a concern about a single case where the client insists. My issues are:
>
> 1)   If we disclose it to one client, do we create issues for ourselves by not disclosing it to all on a regular basis. ...
>
> 4)   Actuarial put together the revenue sharing numbers for internal analysis and never intended for them to be the basis of an external disclosure.

1/5/05 Wilkinson e-mail (Dkt 134-6 at 2–3). Wilkinson concluded, "I don't won't [*sic*] to lose this client over the disclosure of revenue sharing, could we just tell them what the average for their funds [*sic*] without disclosing the specific percentages?" *Id*. (Dkt. 134-6 at 3).

AUL created a revenue sharing "disclosure" in 2007 that allegedly is currently available on an AUL website (and may have been the since late 2007), but that website is not accessible to plan sponsors, trustees or participants. Burns Tr. 208:8–23, 211:17 to 212:3 (Dkt. 134-2). Since the last quarter of 2009 — just a few months after this lawsuit was filed — AUL allegedly

started providing *new* prospective clients with information about the amounts of revenue sharing it receives. Burns Tr. 206:22 to 207:13 (Dkt. 134-2). AUL did not disclose its revenue sharing practices to the Trustee; he learned about it from a family member. Leimkuehler Tr. 100:21–23 (Dkt. 135-3).

AUL also did not provide a dollar-for-dollar credit to the Plan for the revenue sharing payments it received. In one of the Department of Labor's "trilogy of opinion letters" (*see* AUL's memo (Dkt. 129 at 14–15) (discussing  addressing revenue sharing)), the DOL concluded that when a plan provider applies revenue sharing payments toward the amount a plan owes to the provider for services, *then* the revenue sharing arrangement is not a prohibited transaction Department of Labor Opinion No. 97-15A, 1997 WL 277980, *4 ("Frost letter") (if revenue sharing payments "are used to benefit the Plans, either as a dollar-for-dollar offset against the fees the Plans would be obligated to pay to Frost for its services or as amounts credited directly to the Plans," then no prohibited transaction). As the Trustee's expert explained:

> The only way to ensure that the provider is providing a dollar-for-dollar credit is for the provider to disclose its total fee for services to the plan on the front end (e.g., AUL discloses on January 1 that it will charge the Leimkuehler Plan 65 basis points for its services) and then reconcile at the end of the year (e.g., on the following December 31, AUL calculates the dollar value of its 65 basis-points-fee, and remits to the plan any excess that AUL may have earned), in order to ensure that the provider does not receive a great[er] fee than has been disclosed.

Kasten Report (Dkt. 89 at 5). AUL does not dispute that it does none of these things. Kingsley Tr. 132:8 to 134:18 (Dkt. 134-1) AUL does not disclose a total fee for its services, it does not reconcile a disclosed fee amount with the amounts it actually receives in fees, and it never remits money to the Plan. Jackson Tr. 57:25 to 60:2 (Dkt. 135-1). Instead, AUL keeps all of the fees it charges and receives. Kingsley Tr. 50:11–17 (Dkt. 134-1).

**ARGUMENT**

**I.   GENUINE ISSUES OF MATERIAL FACT PRECLUDE A FINDING THAT AUL EXERCISES NO CONTROL OVER MANAGEMENT OR DISPOSITION OF THE PLAN'S ASSETS.**

ERISA broadly defines "fiduciary" to include a person who exercises *any* control over the disposition of a plan's assets. 29 U.S.C. § 1002(21)(A)(i). Courts are to interpret and apply this provision of ERISA (like any other) with an appreciation of its proper role within the overall ERISA scheme and the principles of the common law of trusts that animate ERISA.

"ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans," *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983), and "to safeguard employees from the abuse and mismanagement of funds." *Massachusetts v. Morash*, 490 U.S. 107, 112 (1989). "ERISA's legislative history confirms that the Act's fiduciary responsibility provisions, 29 U.S.C. §§ 1101–1114, 'codif[y] and mak[e] applicable to [ERISA] fiduciaries certain principles developed in the evolution of the law of trusts.'" *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989) (quoting H.R. Rep. No. 93-533, p. 11 (1973), U.S. Code Cong. & Admin. News 1974, pp. 4639, 4649). "ERISA, we have explained, 'abounds with the language and terminology of trust law' and must be construed against the background of the common law of trusts." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 264 (1993) (White, J., dissenting) (quoting *Firestone*, 489 U.S. at 110–11). It imposes on fiduciaries "strict standards of trustee conduct, also derived from the common law of trusts — most prominently, a standard of loyalty and a standard of care." *Central States Pension Fund v. Central Transp., Inc.*, 472 U.S. 559, 570 (1985).

"[C]ourts are to develop a 'federal common law of rights and obligations under ERISA-regulated plans,'" and in doing so are "guided by principles of trust law." *Firestone*, 489 U.S. at

110–11 (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56 (1987)). Indeed, "[t]he common law of trusts … offers a 'starting point for analysis [of ERISA] ... [unless] it is inconsistent with the language of the statute, its structure, or its purposes.'" *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 250 (2000) (quoting *Hughes Aircraft Co. v. Jacobson*, 25 U.S. 432, 447 (1999)).

As this Court has recognized, the "threshold question" in a breach-of-fiduciary-duty case is whether the defendant "was acting as a fiduciary … when taking the action subject to complaint."[5] Dkt. 63 at 14 (quoting *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000)). ERISA defines a fiduciary, in relevant part, as follows:

[A] person[6] is a fiduciary with respect to a plan to the extent

  (i)   he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

  (ii)  he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or

  (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C § 1002(21)(A).

Unlike the common law, ERISA's "definition does not make a person who is a fiduciary for one purpose a fiduciary for every purpose. A person 'is a fiduciary to the extent that' he performs one of the described duties; people may be fiduciaries when they do certain things but be entitled to act in their own interests when they do others." *Johnson v. Georgia-Pac. Corp.*, 19 F.3d 1184,

---

[5] In cases involving a violation of section 1106(b)(3), which categorically prohibits certain kinds of transactions by fiduciaries, the question is merely whether the defendant is a fiduciary at all. If so, 1106(b)(3)'s prohibition applies. *See infra* at 33.

[6] AUL is a "person" within the meaning of ERISA. "The term 'person' means an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization." 29 U.S.C. § 1002(9).

1188 (7th Cir. 1994) (quoting *John Hancock Mutual Life Insurance Co. v. Harris Trust & Savings Bank*, 510 U.S. 86, 93-99 (1993). It is also true, however, that "the definition of a fiduciary under ERISA is 'broader than the common-law definition, and does not turn on formal designations such as who is the  trustee.'" *In re Bucci*, 493 F.3d 635, 641–42 (6th Cir. 2007). *Accord Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 418 n.3 (4th Cir. 1993) ("broader than the common law concept of a trustee"); *see Mertens*, 508 U.S. at 264 (White, J., dissenting) (referring to "ERISA's broader definition of a responsible 'fiduciary'").

### A. The Exercise of *Any* Authority or Control Over Management or Disposition of Plan Assets Creates Fiduciary Status.

ERISA's definition of "fiduciary" is broader than the common law definition in that is that it provides "a person is a fiduciary with respect to a plan to the extent (i) he … exercises *any* authority or control respecting management or disposition of its assets …." 29 U.S.C. § 1002(21)(A)(i) (emphasis added). "ERISA … defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan, *see* 29 U.S.C. § 1002(21)(A), thus expanding the universe of persons subject to fiduciary duties—and to damages—under § 409(a)." *Mertens*, 508 U.S. at 262.

Unlike plan management or plan administration which require "discretionary" authority or control, "it is irrelevant" whether someone who exercises control over the disposition of plan assets also "exercised 'discretion.'" *Chao v. Day*, 436 F.3d 234, 236 (D.C. Cir. 2006). "'[A]ny authority or control' is enough." *Id*. This is so "[b]ecause the disposition clause contains no 'discretion' requirement." *Id*. "This distinction is not accidental—it reflects the high standard of care trust law imposes upon those who handle money or other assets on behalf of another." *FirsTier Bank, N.A. v. Zeller*, 16 F.3d 907, 911 (8th Cir. 1994).

11

> As a general matter, a relationship of trust is established when one acquires possession of another's property with the understanding that it is to be used for the owner's benefit, and in these circumstances an obligation arises on the part of the one in possession to act in the owner's bests interests rather than his own.

*Coldesina v. Estate of Simper*, 407 F.3d 1126, 1134 (10th Cir. 2005). Anyone who controls plan assets could use "the plan's money to pay his business expenses or go on vacation," and "this practical reality is precisely why control over assets is treated differently than control over management." *Id*. at 1133–34.

The power to transfer plan assets is "authority or control" over the disposition of plan assets. Thus, for example, "[t]he right to write checks on plan funds is 'authority or control respecting management or disposition of its assets.'" *IT Corp. v. General Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997). In *IT Corp.*, "General American was authorized 'to issue and accept checks drawn'" on a plan's bank account. *Id*. "This provision means that as a practical matter, a substantial amount of money would be under the control of General American, in the form of a bank account which it could deplete by writing checks." *Id*. "The words of the ERISA statute, and its purpose of assuring that people who have practical control over an ERISA plan's money have fiduciary responsibility to the plan's beneficiaries, require that a person with authority to direct payment of a plan's money be deemed a fiduciary." *Id*.; *see also LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997) (signatory who wrote checks on plan funds was a fiduciary).

Similarly, in *Coldesina*, one of the accountant defendants "received plan contribution funds from the plan, which he deposited into his business account, and then wrote checks on behalf of the plan." 407 F.3d at 1133. "This arrangement was initially set up to facilitate better recordkeeping; however, the practical reality is that [defendant] had total control over the plan's money while it was in his account." *Id*. The Tenth Circuit found these facts "even more

12

compelling" than those of *IT Corp.* "because the account at issue belonged to the accountant defendants and not to the plan itself." *Id.* at 1134.

> [H]ere, where the plan was not affiliated with the account and had no authority to oversee its activities, it depended upon [defendant] to ensure the funds were handled properly. Indeed, to say that the accountant defendants did not control the money while it was in their account is to say that no one had control during that time.

*Id.*

In *Smith v. Provident Bank*, 170 F.3d 609 (6th Cir. 1999), a bank removed stock shares from a plan participant's account (after the shares had appreciated in value) and replaced them with cash in the amount the participant "had paid for the shares less dividends that he had received since the purchase date." *Id.* at 612. The court held that these acts constitute control of plan assets making the bank "liable under ERISA as a fiduciary." *Id.* at 613.

In *Briscoe v. Fine*, 444 F.3d 478 (6th Cir. 2006), the third-party administrator of a plan, PHP:

> exercised control over assets in the Company's self-funded plan by allotting to itself an administrative fee and returning the remaining funds after its relationship with the Company terminated. On these facts, we hold that PHP exercised at least partial control over plan assets and, to the extent that it did so, qualifies as a fiduciary.

*Id.* at 494-95.

In *Chao v. Day*, 436 F.3d 234 (D.C. Cir. 2006), an insurance broker, Day, "accepted hundreds of thousands of dollars from twenty-nine ERISA-covered employee benefit plans[7] for the purpose of purchasing insurance for the plans." *Id.* at 235.

> Day undeniably had "authority or control" over the "disposition" of the plans' "assets." The plans sent to Day checks made payable to him. Day then deposited the plans' funds into his account. Day was obligated to "control" the "disposition" of those funds for paying the plans' insurance premiums. Instead, Day absconded with the funds. Because

---

[7] Incidentally, *Day* provides an example of how a person's fiduciary status under ERISA can be determined for multiple plans, in the Supreme Court's words, "in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). Although not relevant to the present motion for summary judgment, *Day* is therefore very relevant to the Trustee's pending motion for class certification, in light of AUL's insistence that its fiduciary status can only be determined on a plan-by-plan basis.

the disposition clause contains no "discretion" requirement, it is irrelevant whether Day exercised "discretion" in his thievery. "[A]ny authority or control" is enough.

*Id*. at 236.

**B.  AUL's Exercise of Authority or Control over the Disposition of the Plan's Assets Precludes Entry of Summary Judgment for AUL.**

Through use of the passive voice in its carefully worded statement of facts, AUL attempts to

conceal its indisputable exercise of authority and control over the disposition of 401(k) plan

assets:

> The Leimkuehler Plan's investments were made via a "separate account." In the insurance world, a separate account is just what it sounds like – an account that is kept separate from the insurance company's general account and is therefore beyond the reach of the company's creditors. "In the 401(k) context, a separate account works very much like a mutual fund:  Both allow investors to experience the return of underlying securities without having to buy them directly." Rather than receiving shares of a mutual fund, participants receive "accumulation units" in the separate account.
>
> In practice, the operation of the separate account is straightforward. An employer collects payroll deductions from plan participants, adds any matching contributions, and then sends those funds to AUL. "Once AUL has received the contributions, it invests them in mutual funds in accordance with directions that plans and plan participants have previously provided."

Dkt. 129 at 7–8 (citations omitted). This is an admission of fiduciary status.

First, the funds that an employer sends to AUL are 401(k) retirement contributions, and they

are unquestionably "plan assets" within the meaning of ERISA.[8] Second, the insurance company

separate account[9] "via" which the Plan's "investments were made" is *AUL*'s separate account, an

account which AUL established, AUL owns, and AUL — and AUL alone — controls.

Leimkuehler GAC (Dkt. 128-11) at 4 § 1.15 ("Our 'Series Separate Account II' is a separate

account we maintain under Indiana law."); *see also id.* at 40 § 9.1 ("All amounts received or

---

[8] 29 C.F.R. § 2510.3–102(a)(1) ("the assets of the plan include amounts (other than union dues) that a participant or beneficiary pays to an employer, or amounts that a participant has withheld from his wages by an employer, for contribution").

[9] *See infra* at 17–18 (discussing "separate accounts").

credited under this contract become the property of AUL."); *see also id.* at 15 § 9.16 ("We own all Mutual Fund or Portfolio shares held in an Investment Account."). Third, the Plan's "investments were made" *by AUL* "via" AUL's separate account. In other words, AUL receives plan assets in an account over which AUL has exclusive control, and then AUL takes those plan assets out of AUL's account and invests them in mutual funds.

That exercise of control over the disposition of plan assets makes AUL a fiduciary. Whether AUL exercises discretion when it invests the Plan's assets or, instead, invests the Plan's assets in mutual funds "in accordance with directions" from the Plan or its participants (as AUL maintains), is "irrelevant." *Chao*, 436 F.3d at 236. "'[A]ny authority or control' is enough." *Id.*

The one common element of control found in each of the cases discussed above is the fiduciary-defendants' ability to transfer plan assets. In *IT Corp.*, *Coldesina* and *Day*, the defendants all had control because they had check writing privileges on plan assets. In *Smith*, the defendant could move stock shares and cash in and out of participants' accounts. In *Briscoe*, the defendant could take fees for itself directly from an account holding plan assets and could transfer plan assets to the employer. This case presents *all* of those same, dispositive elements of control over the disposition of plan assets.

- As in *Day*, where "plans sent to Day checks made payable to him," and *Coldesina*, where defendants "received plan contribution funds from the plan," here "[a]n employer collects payroll deductions from plan participants, adds any matching contributions, and then sends those funds to AUL." Dkt. 129 at 8.

- As in *Day* and *Coldesina*, where the defendants deposited plan assets in the defendants' own accounts, when AUL receives plan contributions, it puts them in AUL's separate accounts. Dkt. 129 at 7; Tatum Tr. 32:11 to 33:25 (Dkt. 134-5); Welsh Tr. at 40:15 to 41:3; 50:24 to 51:1 (Dkt. 134-3).

- As in *Day*, where "Day was obligated to 'control' the 'disposition' of those funds for paying the plans' insurance premiums," AUL is "obligated" to control the disposition of plan assets by investing them in mutual funds Dkt. 128-11 at 4 § 1.15

15

(group annuity contract provides that "[a]mounts allocated to any Investment Account are invested in the share of the corresponding Mutual Fund")).

- As in *Smith*, where the bank could move shares of securities assets in an out of a participant's account, AUL allocates "accumulation units" to a participant's account. Dkt. 129 at 7–8. ("a separate account works very much like a mutual fund" but "[r]ather than receiving shares of a mutual fund, participants receive 'accumulation units' in the separate account"); Dkt. 128-11 § 5.2 at 10 ("We credit amounts allocated to an Investment Account in Accumulation Units.").

- As in *Briscoe*, where the third-party administrator "allot[ed] to itself an administrative fee" out of plan assets, AUL allots to itself fees from the plan assets it holds in its separate accounts. Dkt. 128-11 at 11, 36 (Article 6 – Asset and Administrative Charges).

Just as General American's check writing privileges in *IT Corp.* meant "that as a practical matter, a substantial amount of money would be under the control of General American, in the form of a bank account which it could deplete by writing checks," 107 F.3d at 1421, AUL has a substantial amount of retirement money under its control in its separate account, which AUL could deplete by transferring funds from it. To paraphrase *Coldesina*:

> [H]ere, where the plan was not affiliated with the account and had no authority to oversee its activities, it depended upon [AUL] to ensure the funds were handled properly. Indeed, to say that [AUL] did not control the money while it was in [AUL's separate account] is to say that no one had control during that time.

407 F.3d at 1134.

To top off its substantial control over the Plan's assets, AUL also claims it *owns* the Plan's and its participants' contributions:  "All amounts received or credited under this contract become the property of AUL." Dkt. 128-11 at § 9.1. AUL also asserts ownership of "all shares of a Mutual Fund … held in an Investment Account."[10] Dkt. 128-11 at § 9.16.

---

[10] To the extent AUL's assertion of ownership is an assertion of anything more than nominal ownership (as appears to be the intent), it flies in the face of ERISA regulations. The Department of Labor has defined "plan assets" to include assets held in an insurance company separate account. 29 CFR § 2510.3-101(h)(1)(iii) (entitled "Definition of 'plan assets'— plan investments") ("when a plan acquires or holds an interest in any of the following entities its assets include its investment and an undivided interest in each of the underlying assets of the entity: … (iii) A separate account of an insurance company"). Thus,

AUL exercises authority and control over the disposition of the Leimkuehler Plan's assets. That indisputable fact alone precludes the entry of summary judgment for AUL on the issue of fiduciary status.[11] As discussed below, however, AUL exercised significantly greater authority and control over the Plan's assets.

### C.  AUL's Exercise of Authority or Control over the Management (or Disposition) of the Plan's Assets Precludes Entry of Summary Judgment for AUL.

Not only does AUL exercise control over the *disposition* of plan assets, AUL exercises control over the *management* of plan assets. Section 1002(21)(A)(i) makes a fiduciary of anyone who "exercises any authority or control respecting management or disposition of its assets." Again, as with disposition of plan assets, the exercise of authority or control over the management of plan assets need not be discretionary. *Cf.* 29 U.S.C. § 1002(21)(A)(i) ("exercises any *discretionary* authority or *discretionary* control respecting management of such plan) *and* § 1002(21)(A)(iii) ("any *discretionary* authority or *discretionary* responsibility in the administration of such plan") (emphasis added).

---

the Leimkuehler Plan is the real owner of the assets in AUL's separate account; AUL is merely a nominal owner — an owner in name only.

[11] The Trustee submits that the evidence he proffers in this memorandum would entitle *him* to summary judgment on the issue of AUL's fiduciary status, but he has not filed a cross-motion for summary judgment at this time because the "one way intervention" rule prohibits him from seeking any determination of the merits of the claims he has asserted on behalf of the proposed class. *See, e.g., Premier Elec. Const. Co. v. National Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 362 (7th Cir. 1987) ("So a person's decision whether to be bound by the judgment—like the court's decision whether to certify the class—would come well in advance of the decision on the merits."). The "one way intervention" rule is a protection for defendants that a defendant may waive, as AUL has done here by filing a motion for summary judgment prior to a class determination. *Roberts v. American Airlines, Inc.*, 526 F.2d 757, 762–63 (7th Cir. 1975) ("defendants, by moving for summary judgment prior to the class determination and the sending out of class notice, assumed the risk that a judgment in their favor would not protect them from subsequent suits by other potential class members"). It prevents a situation in which absent class members learn the court's views on merits issues in the case before deciding whether to opt in or out of the class. Whether this will be a compulsory class or one in which class members have an opportunity to opt out has not yet been decided.

17

**1. AUL established, owns and controls the separate account and its "investment accounts," and AUL determines the value of investment account accumulation units.**

As already described, in an AUL 401(k) plan, the investment of plan assets in mutual funds is a two-step process. First, participants buy "accumulation units" in AUL's "separate account." Second, AUL takes invests money from the separate account in mutual funds. The following discussion focuses on the first step:  participants' initial investment in AUL's separate account.

As AUL explains, "The Leimkuehler Plan's investments were made via a 'separate account.'" Dkt. 129 at 7. "Rather than receiving shares of a mutual fund, participants receive 'accumulation units' in the separate account." Dkt. 129 at 7–8. AUL defines an accumulation unit as "a statistical device used to measure amounts of increases to, decreases from, and accumulations in any Investment Account during the Accumulation Period."[12] Dkt. 128-11 § 1.3 at 22. ERISA defines "separate account":

> The term "separate account" means an account *established or maintained by an insurance company* under which income, gains, and losses, whether or not realized, from assets allocated to such account, are, in accordance with the applicable contract, credited to or charged against such account without regard to other income, gains, or losses of the insurance company.

29 U.S.C. § 1002(17) (emphasis added). In other words, a separate account is an account which segregates and holds the assets of 401(k) plans "separate" from the insurance company's assets in its general account. As AUL notes, assets in an insurance company separate account are "beyond the reach of the [insurance] company's creditors," and the reason is because the money insurance companies hold in separate accounts belongs to others.

---

[12] AUL's Director of Separate Accounts Administration testified that an "accumulation unit" is "a form of measurement." Tatum Tr. 42:5–6 (Dkt. 134-5). "Q. Like a meter or a yard? A. You could say that, I guess, yeah. Q. Okay. How would a separate account unit be similar to a meter or a yard? A. It's just a way of measuring the size or volume of a particular aspect of something. Q. Okay. A. Like a pound. I mean, it's a unit." *Id.* at 42:7–14 (Dkt. 134-5).

AUL unilaterally determines the value of an "accumulation unit" pursuant to a formula AUL created. Dkt. 128-11 § 5.3 at 10.[13] At his deposition, AUL's Director of Separate Accounts Administration Tatum Tr. 12:1–2 (Dkt. 134-5) was unable to explain the formula (*id*. at 41:25 to 44:25), but he testified that it is "available in a unit value calculation spreadsheet" created in his department and kept on the department's LAN (local area network) drive. *Id*. at 45:4–5, 9–18 (mistranscribed as "land drive").

Thus, AUL "exercises any authority or control respecting management or disposition" of plan assets through the following:

- AUL established, owns and controls the "Series Separate Account II" and the "Investment Accounts" in it. Dkt. 128-11 at 4 § 1.15 ("Our 'Series Separate Account II' is a separate account we maintain under Indiana law."); *see also id*. at 40 § 9.1 ("All amounts received or credited under this contract become the property of AUL."); *id*. at 15 § 9.16 ("We own all Mutual Fund or Portfolio shares held in an Investment Account.").

- AUL allocates 401(k) contributions to investment accounts in AUL's separate account. Dkt. 128-11 § 5.2 at 10 ("we allocate the Contribution to the Investment Account").

- AUL "credit[s] amounts allocated to an Investment Account in Accumulation Units." Dkt. 128-11 § 5.2 at 10.

- AUL uses the accumulation unit value in effect "when we allocate the Contribution to the Investment Account." Dkt. 128-11 § 5.2 at 10 ("The Accumulation Unit value used is the one for the Valuation Period when we allocate the Contribution to the Investment Account").

- AUL determines the accumulation unit value for each Investment Account. Dkt. 128-11 at 10 § 5.3.

- AUL created the formula for determining accumulation unit value. Dkt. 128-11 at 11 §§ 5.3–5.4 (generally describing formula).

AUL performs these valuations and allocations of plan assets internally — effectively, inside a black box and behind a curtain. Plan sponsors and trustees like Mr. Leimkuehler have no way

---

[13] "We establish the initial Accumulation Unit for a new Investment Account on the inception date of that Investment Account. The value of an Accumulation Unit for any later Valuation Period equals the value of an Accumulation Unit for the immediately preceding Valuation Period times the Net Investment Factor for the current Valuation Period. We determine the Accumulation Unit value before giving effect to any additions, withdrawals, or transfers in the current Valuation Period." Dkt. 128-11 at 10 § 5.3. *See generally id*. at 10–11, 34–35 ("ARTICLE 5 – VALUATIONS").

of verifying either that AUL in fact uses the formula it says it uses or that AUL performs its

calculations accurately. They have to *trust* AUL to do it appropriately and correctly. Thus,

through these functions, AUL assumes a position of trust in its "management or disposition" of

the plan assets in its separate account. That makes AUL a fiduciary and precludes the entry of

summary judgment for AUL on the issue of fiduciary status.

### 2.   AUL selects and limits the investment options available to the Plan.

The second step in the investment process is that AUL takes the Plan's assets from the

separate account and invests them in mutual funds. According to AUL, "Once AUL has received

the contributions, it invests them in mutual funds in accordance with directions that plans and

plan participants have previously provided." Dkt. 129 at 8. Again, because the exercise of "*any*

authority or control respecting the management or disposition of" plan assets is enough to make

AUL a fiduciary, whether it exercises discretion or merely follows directions when it invests

plan assets in mutual funds is irrelevant. In fact, however, AUL exercises significantly more

authority and control over which mutual funds the Plan ultimately invests in, and those acts of

authority and control are additional, independent bases of AUL's fiduciary status.

### a.   AUL selects and limits the mutual funds in which the Plan's assets may be invested.

AUL insists that it merely "assembl[es] ... a menu of investment options" for plans and that

such conduct does not constitute "fiduciary conduct." Dkt. 128 at 17. In fact, AUL selects and

limits which mutual funds will be available to its 401(k) plans and that is a "fiduciary function"

according to ERISA regulations.

The fact that AUL selects and limits investment options is not legitimately disputable.

According to the Investment Company Institute (which describes itself as "the national

association of U.S. investment companies, including mutual funds"),[14] there were 7,581 mutual funds in the U.S. mutual fund industry in 2010. Dkt. 135-5 (excerpt of 2011 Investment Company Fact Book). As of August 2010, however, AUL's 401(k) plans could invest in only 383 from among the 7,581 U.S. mutual funds then available. Dkt. 128-18 at 8, 15–23. The reason a plan can only invest in those 383 funds is those are the only funds AUL makes available in its 401(k) products. Kingsley Tr. 100:6–8; 140:25 to 141:1 (Dkt. 134-1). That is not the mere presentation of a suggested list of mutual funds. It is an act of selection and limitation of the universe of mutual funds available to plans for investment. According to the Department of Labor, "the act of limiting or designating investment options which are intended to constitute all or part of the investment universe of an ERISA 404(c)[15] plan *is a fiduciary function*." Final Regulation Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans), 57 FR 46906-01 at n.27 (emphasis added).

The DOL's conclusion that the act of limiting the universe of funds is a fiduciary function makes perfect sense.[16] First of all, the act of selecting the funds in which a plan can invest channel's plan assets into the selected funds and only the selected funds. That constitutes at least

---

[14] http://www.ici.org/about_ici (last viewed on 7/22/2011).

[15] AUL's 401(k) plans are 404(c) plans, which are "pension plan[s] which provide[] for individual accounts and permit[] a participant or beneficiary to exercise control over the assets in his account." 29 U.S.C. § 1104(c)(1)(A).

[16] In addition to making sense, the DOL's conclusion (which appears in footnote 27 to the final regulation) is also entitled to *Chevron* deference. The footnote is entitled to deference because the DOL published it in the Federal Register along with the regulation as part of the notice and comment rulemaking process, and also because the footnote is the Department's interpretation of its own regulation. *See Langbecker v. Electronic Data Sys. Corp.*, 476 F.3d 299, 310–11 & n.22 (5th Cir. 2007) (discussing without deciding applicability of *Chevron* standard to footnote 27).

Also, footnote 27 and the Secretary's brief in *Hecker* are not in conflict. While the Secretary (in her brief) rejected the *Hecker* plaintiffs' theory that Fidelity became a fiduciary "merely by virtue of developing and presenting a list of investment options to Deere for its selection,'" she also wrote that "if the complaint can plausibly be read as alleging that Fidelity in fact made the selection regarding investment options that would be available under the plan." Dkt. 128-17 at 22–23.

*some* control over the "management or disposition" of plan assets (and "any" control is enough). Moreover, no dire consequences result from that conclusion. As AUL argues throughout its memorandum, a person is a fiduciary only to the extent that the person performs a fiduciary function. If service providers are held to be acting as fiduciaries when they limit the universe of funds available to a plan, then they will simply be held to fiduciary standards in their selection of funds, and well they should be.

If service providers like AUL are not ensuring the suitability of the mutual funds it offers to 401(k) plans in the first instance, then who is? Plan fiduciaries like the Trustee hire providers like AUL, in part, to ensure that their plans invest their retirement funds in suitable investments. Mr. Leimkuehler does not evaluate mutual funds for investment suitability; he makes prosthetic devices. He hired AUL to provide him with suitable funds for investment. AUL knows that is true not just for Mr. Leimkuehler, but for all of the plan fiduciaries it does business with, which is precisely the reason AUL is selective about the mutual funds it offers to plans. AUL's Assistant Vice President of Products and Investments (Burns Tr. 15:9–10 (Dkt. 134-2)), Terry Burns, testified that AUL "do[es][17] a due diligence report that scores the investment options on our platform," and before adding a mutual fund to the list it offers to plans, AUL "screens" it using "a lot of factors."[18] Burns Tr. 23:17–23 (Dkt. 134-2). A fund that makes it through the screening process must then be approved by AUL's Product Development Committee, AUL's vice president in its Retirement Services department, AUL's "legal representative," and AUL's

---

[17] Until 2009, AUL performed the due diligence in-house, but it now outsources it. Burns Tr. 19:10–20 (Dkt. 134-2).

[18] "Performance. Past performance. Expense ratio. A lot of modern portfolio theory statistics, alpha, beta. Standard deviation. Investment manager tenure. Investment manager turnover. The size, the asset size of the fund. There's probably more, but that's what I can think of right now." Burns Tr. 23:17–23 (Dkt. 134-2).

controller. Burns Tr. 37:5–11 (Dkt. 134-2). That due diligence screening process is the essence of what a fiduciary *should* do.

Moreover, *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009), does not foreclose a finding that AUL was a fiduciary by virtue of its selection of mutual funds for its 401(k) plans. Although the *Hecker* plaintiffs "argue[d] that Fidelity Trust exercised the necessary control to confer fiduciary status by its act of limiting Deere's selection of funds through the Trust Agreement to those managed by Fidelity Research," the court did not agree with the factual premise of that argument. *Id.* at 583. "[T]he Trust Agreement [gave] Deere, not Fidelity Trust, the final say on which investment options [would] be included. The fact that Deere may have discussed this decision, or negotiated about it, with Fidelity Trust does not mean that Fidelity Trust had discretion to select the funds for the Plans." *Id.* Thus, in contrast with the present case, Deere was not stuck with the investment options proposed by Fidelity, even though it ultimately went with Fidelity's recommendations. *Cf.* Jackson Tr. 82:21–24 (Dkt. 135-1) ("Q: Okay. So you're limited to just the fund and the particular share class that AUL provides you with when you're using AUL's plans, correct? A: Or any other carrier, correct.") *and* Wright Tr. 59:11 to 60:3 (Dkt. 135-2) ("Q: So AUL limits and controls the funds that are available or that you can make available to the plan trustee? [objection omitted] A: Yes. I mean, but there's so many there that it becomes, I mean, to the point where you're not looking for another fund.").

Moreover, unlike the *Hecker* plaintiffs, the Trustee has alleged that "AUL exercises ultimate control over the investment options it makes available to the 401(k) plans it serves." Dkt. 1 at 3–4, ¶ 18.

> There is an important difference between an assertion that a firm exercised "final authority" over the choice of funds, on the one hand, and an assertion that a firm simply "played a role" in the process, on the other hand. The Complaint on which the Hecker group proceeded made the latter allegation, not the former. It gave no notice to the

23

> defendants that they would be required to defend on the former basis. For that reason, we reject plaintiffs' tardy effort to present the *de facto* fiduciary argument, and we make no comment on the possible scope of the "functional fiduciary" concept.

*Hecker*, 556 F.3d at 584. AUL's list of investment options is not a mere proposal for a plan's consideration, any more than the Plan's menu of investment options is merely a proposal for participants' consideration. Wright Tr. 63:12 to 64:18 (Dkt. 135-2). Just as the Trustee limits or designates "investment options which are intended to constitute all or part of the investment universe" for participants, AUL *first* limits or designates "investment options which are intended to constitute all or part of the investment universe" that the Trustee can offer to his plan. AUL has the "final say" on which mutual funds can be included in a plan's menu. Burns Tr. 37:5–11 (Dkt. 134-2). The Trustee has no discretion to choose a fund that is not on AUL's list; he is forbidden to select a fund not on the list. Jackson Tr. 82:21–22 (Dkt. 135-1); Wright Tr. 59:19 to 60:3 (Dkt. 135-2); Kingsley Tr. 100:6–8, 140:25 to141:1 (Dkt. 134-1); Yoerger Tr. 42:21 to 43:15 (Dkt. 134-4); Burns Tr. 89:3–15 (Dkt. 134-2). AUL's selection of investment options for the list is final and subject to change only by AUL. Jackson Tr. 82:21–22 (Dkt. 135-1); Kingsley Tr. 100:6–8; 140:25 to 141:1 (Dkt. 134-1); Yoerger Tr. 42:21 to 43:15 (Dkt. 134-4); Burns Tr. 89:3–15 (Dkt. 134-2). These facts make this case very different than *Hecker*.

The timing of AUL's "assembly" of the list is immaterial, too. AUL argues that it "could not have had control with respect to the investments of the Plan" because it "assembled a menu *before* it ever contracted with the Leimkuehler Plan." Dkt. 129 at 18. That argument, however, is based on a flawed, implicit assumption. The act of limiting the universe is not something AUL does at one discrete point in time; it does so on a constant, ongoing basis. AUL's "brokerage window" underscores the point that AUL is the gatekeeper of mutual funds available to the plans. If a plan is willing to pay AUL even more fees, then AUL will provide an optional

service[19] through which participants can (allegedly) invest in "virtually every mutual fund in the country, as well as stocks and other investment options."[20] Dkt. 129 at 19. AUL could at any time remove its restriction on the universe of mutual funds the Trustee may offer to the Leimkuehler Plan participants; indeed, AUL *would* do so if the Trustee would pay it more money. The Trustee's decision was to give AUL the Plan's business, and as a result of that decision, the Plan's universe of funds is limited to those AUL selects. The Trustee's decision, however, is not the *only* cause of that limitation on the universe of funds. Once AUL has a plan's business, from that point on, AUL also limits the plan's universe of available funds. *Cf. F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1259 (2d Cir. 1987) (even though a person may not be a fiduciary while it is negotiating its relationship with a plan, after a person has entered into an agreement with a plan, the agreement may give it such control over factors that the person thereby becomes an ERISA fiduciary). Any doubt about who really decides which funds will be included in the universe of available funds should be erased by this undisputed fact:  the universe of funds AUL offers to its plans is limited to mutual funds that pay revenue sharing to AUL. Burns Tr. 28:1–6, 80:5–12 (Dkt. 134-2).

This is not an "either/or" situation in which either the Trustee selects or AUL selects the investment options for the plan. They both do. AUL makes the first and, by far, the most substantial cut when it limits the universe of nearly 8,000 available mutual funds to

---

[19] The reason AUL does not offer the brokerage window as a standard feature is because of money; the mutual funds available through the brokerage window do not pay AUL revenue sharing. Wright Tr. 117:25 to 118:5 (Dkt. 135-2).

[20] Notably, even with respect to the rare plan that *does* pay for a brokerage window, AUL still limits the universe of available mutual funds with respect to a portion of the plan's assets:  participants can only invest "a portion of their plan assets" in investments not on AUL's list of investment options. Burns Tr. 51:25 to 52:4 (Dkt. 134-2).

approximately 383. That is an "exercise of any authority or control respecting management or disposition" of plan assets, and it precludes entry of summary judgment in favor of AUL.

### b. AUL unilaterally selects the share classes of the mutual funds in which the Plan's assets may be invested.

There is another critical investment decision that AUL — and AUL alone — makes: AUL decides in which share class of a mutual fund a plan will be invested. Jackson Tr. 82:21–22 (Dkt. 135-1); Welsh Tr. 31:10–15 (Dkt. 134-3); Burns Tr. 28:24 to 29:4; 203:6–11 (Dkt. 134-2). A plan sponsor or trustee selects investments options such as American Century Ginnie Mae, Oppenheimer Strategic Income, Fidelity Advisor Growth & Income, Russell LifePoints Conservative, American Century Equity Growth, Alger Appreciation Institutional, and so on. Dkt. 128-11 at 17 (table of investment accounts). The Trustee, however, does not select the share class for its plan — AUL does. Welsh Tr. 31:10–15 (Dkt. 134-3); Burns Tr. 28:24 to 29:4, 203:6–11 (Dkt. 134-2).

The shares of a mutual fund differ by classes. The difference between share classes is the amount of their expense ratios.[21] Burns Tr. 29:5–7 (Dkt. 134-2); Welsh Tr. 30:12–23 (Dkt. 134-3). For example, in 2010 the Leimkuehler Plan included the Growth Fund of America as one of its investment options. Leimkuehler 2010 Plan Review (Dkt. 134-13 at 2) (under Large-Cap Stocks). Under the terms of AUL's revenue sharing agreement with American Funds, AUL could invest plan assets in the five following share classes of the Growth Fund of America: R-1, R-2, R-3, R-4 and R-5. American Funds Participation Agreement (Dkt. 134-11) AUL only se-

---

[21] An expense ratio is the percent of an investor's assets that a mutual fund company takes each year in exchange for its services. In other words, it's the fund's price tag, and it comes right out of returns that would otherwise flow to the investor. The expense ratio represents the percentage of the fund's assets that go purely toward the expense of running the fund. The expense ratio covers the investment advisory fee, the administrative costs, 12b-1 distribution fees, and other operating expenses. The expense ratio wraps all these various costs into one number. Thus, for example, a fund with an annual expense ratio of 1.5% is receiving 1.5% of the total money in the fund every year, regardless of whether the fund has a good or bad year.

lects the R-3 or R-4 share classes of the American Funds mutual fund family for its investments of plan money. Burns Tr. 29:24 to 30:6 (Dkt. 134-2). The Leimkuehler Plan invested in Growth Fund of America (Leimkuehler 2010 Plan Review (Dkt. 134-13 at 2)), but AUL never disclosed to the Trustee in which share class it invested the Plan's assets.

Not only does AUL select which share class a plan will be invested in, Mr. Burns (AUL's Assistant Vice President of Products and Investments) testified that AUL does not disclose to plans which share class it selected for them.

> Q.    Does AUL ever disclose which share class, to a plan sponsor or plan trustee, that his separate account investments will be invested in?
>
> A. I don't know of any particular location where that's found.

Burns Tr. 221:17–22 (Dkt. 134-2) (objection omitted).

AUL's share class selection is not only an exercise of "any authority or control respecting management or disposition of its assets," it is also an exercise of "discretionary authority or discretionary control respecting management of such plan." This evidence therefore precludes entry of summary judgment for AUL.

## II.    AUL'S PROVISION OF "INVESTMENT ADVICE" PRECLUDES SUMMARY JUDGMENT ON FIDUCIARY STATUS.

Under the investment advice prong of ERISA, a "fiduciary," is anyone who "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so." 29 U.S.C. § 1002(21)(A)(ii). Department of Labor regulations provide that "[a] person shall be deemed to be rendering 'investment advice' to an employee benefit plan" if:

> (i) Such person renders advice to the plan as to the value of securities or other property, or makes recommendation as to the advisability of investing in, purchasing, or selling securities or other property; and

(ii) Such person either directly or indirectly (e.g., through or together with any affili-ate)—

(A) Has discretionary authority or control, whether or not pursuant to agreement, arrangement or understanding, with respect to purchasing or selling securities or other property for the plan; or

(B) Renders any advice described in paragraph (c)(1)(i) of this section on a regu-lar basis to the plan pursuant to a mutual agreement, arrangement or understand-ing, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, that such services will serve as a primary basis for investment decisions with respect to plan assets, and that such person will render individual-ized investment advice to the plan based on the particular needs of the plan re-garding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments.

29 C.F.R. § 2510.3-21(c)(1) (titled "Definition of 'Fiduciary'").

Boiled down to their essence, these DOL definitions provide two distinct ways a person who makes investment recommendations can become a fiduciary. One is by simply having "discretionary authority or control ... with respect to purchasing or selling securities." *Id*. The other way is by making investment recommendations:  1) "on a regular basis"; 2) "pursuant to a mutual agreement, arrangement or understanding"; 3) "that such services will serve as a primary basis for investment decisions with respect to plan assets"; and 4) "that such person will render individualized investment advice to the plan based on the particular needs of the plan." *Id*.

AUL renders investment advice under both these definitions. The first element of both definitions is the "mak[ing] recommendations as to the advisability of investing in, purchasing, or selling securities." AUL not only *recommends* that plans invest in the investment options on AUL's list of investment options, plans can *only* invest in those investments options. In addition, AUL periodically scores and reviews with plan fiduciaries the investment performance of plans' investment options. *See, e.g.*, Leimkuehler 2010 Plan Review (Dkt. 134-12 to 134-14); Dkt. 128-11 at 53 ("Full Plan Support services include the following services: ... • fund financial reports"); Leimkuehler Tr. 20:22 to 21:3) (Dkt. 135-3); (Welsh Tr. 41:4–19 (Dkt. 134-3) (AUL reviews the

28

funds that are in its investment offerings quarterly. "We have a process where we look at the performance, the manager change, the — we look at — we benchmark expense ratios to make sure that they're competitive. We look at investment style drift. A term of art, if you will, in terms of supposed to be a small cap, are they actually investing in small cap versus drifting to mid or large, something like that. And we then will reserve the right to kind of grade those, those performances. And we actually produce, in Terry's group, a report on those funds."). These both satisfy the threshold "makes recommendations" requirement.

In addition, AUL has "discretionary authority or control ... with respect to purchasing or selling securities." AUL's group annuity contract with the Leimkuehler Plan gives AUL such authority and control:

- AUL reserves the right "to make additions to, deletions from, substitution for, or combinations of, the securities that are held by any Investment Account or that any Investment Account may purchase"; Dkt. 128-11 at 6 § 3.3(a).

- AUL reserves "the right to eliminate or combine existing Investment Accounts if marketing, tax, or investment conditions warrant"; Dkt. 128-11 at 7 § 3.3(b).

- AUL reserves "the right to transfer assets from any Investment Account to another separate account of AUL or Investment Account"; Dkt. 128-11 at 7 § 3.3(b).

- AUL reserves the right to "combine one or more Investment Accounts and [to] establish a committee, board, or other group to manage one or more aspects of the Investment Accounts." Dkt. 128-11 at 7 § 3.3(c).

- AUL reserves "the right to eliminate the shares of any of the eligible Mutual Funds, Portfolios, or other entities and to substitute shares of, or interests in, another Mutual Fund, Portfolio, or another investment vehicle, for shares already purchased or to be purchased in the future under the contract, if the shares of any or all eligible Mutual Funds, Portfolios, or other entities are no longer available for investment or if further investment in any or all eligible Mutual Funds, Portfolios, or other entities becomes inappropriate in view of the purposes of the contract"; Dkt. 128-11 at 6 § 3.3(a).

- "[i]n the event of any such substitution or change," AUL reserves the right to "make such changes in this contract as may be necessary or appropriate to reflect such substitution or change" in place of those chosen by a plan sponsor or trustee; Dkt. 128-11 at 7 § 3.3(c).

29

Clearly, these contractual provisions vest in AUL "discretionary authority or control ... with respect to purchasing or selling securities." Thus, whether AUL provides investment advice under the DOL's first definition is, at the very least, a genuinely disputed issue of material fact.

In addition, AUL provides investment advice to the Plan under the DOL's second definition. First, AUL provides the Plan annual reviews and scoring of investment performance, which constitute "mak[ing] recommendation[s] as to the advisability of investing in, purchasing, or selling securities," "on a regular basis." *See, e.g.*, Leimkuehler 2010 Plan Review (Dkt. 134-12 to 135-14). Second, AUL provides that advice to the Plan pursuant to its group annuity contract, or in the words of the DOL definition, "pursuant to a mutual agreement, arrangement or understanding." Dkt. 128-11 at 53 ("Full Plan Support services include the following services: ... • fund financial reports").

AUL provided to the Trustee and the Plan a comprehensive, turnkey package of 401(k) services, from initial plan set up to participants' retirement distributions. Those services included the offering of a list of investment options that AUL had thoroughly vetted, and the Trustee relied on those investment recommendations. Leimkuehler Tr. 20:22 to 21:15 (Dkt. 135-3). Retirement plan providers like AUL make it possible for small business owners like the Trustee to offer retirement plans to their employees. AUL intends for those business owners to rely on it for the everything they need to run a retirement plan, including where a plan should invest its assets. All of this evidence — how AUL sets up plans; how it runs plans day-to-day; how it ensures its plans are in compliance with applicable laws, regulations and reporting requirements; how it selects and reviews mutual funds as investment choices; how it retains authority to make unilateral changes to investment options — creates a genuine issue of whether AUL expected plans like the Trustee to rely on it for investment recommendations. AUL's comprehensive

30

package of services and the terms of its group annuity contract evinces an intent "that such

services will serve as a primary basis for investment decisions with respect to plan assets."

Finally, AUL "render[s] individualized investment advice to the plan based on the particular

needs of the plan." *See* Leimkuehler 2010 Plan Review (Dkt. 134-12 to 134-14). Whether AUL

provides investment advice under the DOL's second definition is thus a genuinely disputed issue

of material fact.

### III. AUL'S DISCRETIONARY AUTHORITY OR RESPONSIBILITY PRECLUDES SUMMARY JUDGMENT ON FIDUCIARY STATUS.

AUL also has discretionary authority or discretionary responsibility in the administration of

its 401(k) plans. In *Rud v. Liberty Life Assur. Co. of Boston*, 438 F.3d 772 (7th Cir. 2006), the

Seventh Circuit held that Liberty Life was a plan administrator, even though "[i]t may seem odd

that Liberty Life should be administering the plan, when Andersen is the plan administrator." *Id*.

at 774.

> The oddness is dissipated by recognizing that administration is divided. Andersen de-
> cides who is eligible to participate in the plan and explains the plan to its employees,
> but the determination of eligibility to receive benefits under the plan is confided to Lib-
> erty Life. This division gives the insurance company discretionary authority over claim
> applications, making it an ERISA fiduciary.

*Id*. The policy Liberty issued to Andersen provided that it "shall possess the authority to construe

the terms of this policy and to determine benefit eligibility hereunder." *Id*. "This combination

makes Liberty Life an ERISA fiduciary." *Id*.

AUL provides day-to-day administration of the Leimkuehler Plan or as AUL describes it in

its contract "full plan support." Dkt. 128-11 at 51–53 ("AUL Record Keeping/Administrative

Services Agreement" listing all services AUL provides to the Plan). Moreover, as noted above,

AUL reserves to itself substantial discretion in the administration of the Plan including the right

"to make additions to, deletions from, substitution for, or combinations of, the securities that are

held by any Investment Account," "the right to transfer assets from any Investment Account to

another separate account of AUL or Investment Account," the right to "combine one or more

Investment Accounts and [to] establish a committee, board, or other group to manage one or

more aspects of the Investment Accounts," "the right to eliminate the shares of any of the

eligible Mutual Funds, Portfolios, ... if further investment in any or all eligible Mutual Funds ...

becomes inappropriate in view of the purposes of the contract." *See supra* at 29.

In *Midwest Cmty. Health Serv., Inc. v. American United Life Ins. Co.*, 255 F.3d 374 (7th Cir.

2001), the court held that AUL's reservation — in its group annuity contract — of the "right to

make certain changes in the future" without consent made AUL a fiduciary, "because AUL had

discretionary authority over the contract in its ability to amend the value of the contract." *Id.* at

375, 377. AUL's numerous, substantial reservations of rights in its contract[22] with the

Leimkuehler Plan give AUL "discretionary authority over the contract in its ability to amend the

value of the contract." *Midwest*, 255 F.3d at 377. AUL's discretionary authority precludes entry

of summary judgment in AUL's favor.

## IV.  ERISA'S "TO THE EXTENT" LIMITATION ON FIDUCIARY STATUS DOES NOT DEFEAT THE TRUSTEE'S CLAIMS.

Throughout its brief, AUL repeatedly asserts that to prevail on his claims, the Trustee "must

show that AUL's receipt of revenue sharing was undertaken in a fiduciary capacity." Dkt. 129 at

2. AUL is wrong. Its argument is based on a misunderstanding of ERISA and on a

misunderstanding of the Trustee's revenue sharing claim.

The requirement in a breach-of-fiduciary-duty case that the defendant have "act[ed] as a

fiduciary … when taking the action subject to complaint," *Pegram v. Herdrich*, 530 U.S. 211,

---

[22] In Article 7, entitled "Contract Modifications," AUL also reserves its right (among others) to "change the charges set out in Article 6," (asset and administrative charges) without obtaining the affirmative consent of a plan sponsor or trustee. Dkt. 128-11 at 12 §§ 7.2, 7.4.

226 (2000), means only that the non-fiduciary functions a person performs for a plan cannot be the basis of liability for a breach of fiduciary duty. Thus, for example, in *Brandt v. Grounds*, 687 F.2d 895 (7th Cir. 1982), a disloyal plan trustee, using the forged signature of another plan trustee, withdrew money from a plan bank account that required the signature of two trustees for withdrawals. *Id*. at 896. In addition to providing banking services to the plan, the bank provided the plan investment advice for a fee, making it a functional fiduciary. *Id*. at 897. The plan's trustees sued the bank on a breach of fiduciary duty theory for allowing the dishonest trustee to make the withdrawals. *Id.* at 896. The court held that "the Bank's fiduciary status was limited to its function as an investment advisor," and that the "depository transactions" were not part of the Bank's "advisory function." *Id*. at 898. Thus, the bank could not be held liable for a breach of fiduciary duty based on the withdrawals. *Id*.

In the present case, "the action subject to complaint" is not merely AUL's receipt of revenue sharing. The Trustee has not taken the position that revenue sharing is *per se* unlawful. Rather, the Trustee's claim is that revenue sharing the way AUL does it — without disclosure to a plan fiduciary and without a dollar-for-dollar credit against AUL's fees — violates ERISA. Thus, "the action subject to complaint" in this case is more in the nature of omissions than actions:  AUL's failure to disclose revenue sharing and AUL's failure to properly credit revenue sharing to plans. At the times AUL was functioning as a fiduciary with respect to the Leimkuehler Plan, AUL did not disclose revenue sharing to the Trustee, and AUL did not give the Plan a dollar-for-dollar credit for revenue sharing amounts it had received. Accordingly, AUL "act[ed] as a fiduciary … when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).

Furthermore, AUL cites no authority suggesting that the "to the extent" limitation applies to section 406(b)(3) prohibited transactions. Section 406(b)(3) provides that "[a] fiduciary with

33

respect to a plan shall not … receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3). Under this statute, the question is not whether AUL's receipt of revenue sharing constitutes a fiduciary act. Instead, if AUL is a fiduciary of the Plan in any capacity, the question is whether AUL's receipt of revenue sharing constitutes receipt of consideration for AUL's own personal account from "a party dealing with [the] plan in connection with a transaction involving assets of the plan." If so, then AUL has violated section 406(b)(3).

    "Section 406 supplements an ERISA fiduciary's general duties of loyalty and prudence to the plan's beneficiaries, as set forth in section 404, 29 U.S.C. § 1104, 'by categorically barring certain transactions deemed "likely to injure the pension plan."'" *Keach v. U.S. Trust Co.*, 419 F.3d 626, 635 (7th Cir. 2005) (quoting *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 241-42 (2000) (quoting *Commissioner v. Keystone Consol. Indus., Inc.,* 508 U.S. 152, 160 (1993))). Unlike section 1002(21)(A), which focuses on functions and makes a person a fiduciary only "to the extent" he or she engages in an enumerated function, section 1106(b) focuses on relationships and establishes "*per se* rules" that apply to anyone who is a fiduciary to *any* extent.

> [S]ection 406 of ERISA, 29 U.S.C. § 1106, prohibits transactions in which the potential for misuse of plan assets is particularly great. The prohibited transaction rules focus primarily on the relationship between the benefit plan and other parties to a transaction, and the section prohibits transactions where those dealing with the plan may have conflicting interests which could lead to self-dealing. For example, section 406(a)(1)(B) prohibits loans between benefit plans and parties in interest. The *per se* rules of section 406 make much simpler the enforcement of ERISA's more general fiduciary obligations.

*Leigh v. Engle*, 727 F.2d 113, 123 (7th Cir. 1984). Thus, because AUL performs fiduciary functions for the Plan, ERISA's *per se* prohibited transaction rules apply to it.

The Second Circuit rejected an argument similar to AUL's in *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209 (2d Cir. 1987):

> [A]n investment manager for an ERISA plan must unequivocally cease to serve in that position and terminate in writing all contracts or arrangements with the plan concerning that position before playing any role in transactions denied to fiduciaries by Section 406. It cannot be a fiduciary every other hour and the recipient of plan assets in the intervals.

*Id*. at 1219. That same rationale applies with equal force to AUL here.

AUL's reading of section 406(b)(3) would render it meaningless. First of all, the transactions section 406(b) categorically prohibits are, by definition, not "fiduciary acts." To the contrary, they constitute self-dealing and are the antithesis of fiduciary acts, which is the reason Congress has categorically forbidden them. Second, with respect to section 406(b)(3) specifically, AUL's interpretation requiring proof that a fiduciary is "acting as a fiduciary" when he "receive[s] consideration for his own personal account" leads to an absurd result. Because a fiduciary's receipt of "consideration *for his own personal account*" is never, by definition, a fiduciary act, if AUL's reading were adopted, no fiduciary could ever be guilty of a section 406(b)(3) prohibited transaction.

## CONCLUSION

For the foregoing reasons, the Court should deny AUL's motion for summary judgment.

Respectfully submitted,


  /s/ *Kathleen A. DeLaney*
Kathleen A. DeLaney
Edward O. DeLaney
Amanda Couture
DELANEY & DELANEY LLC
3646 N. Washington Blvd.
Indianapolis, IN  46205
Phone: (317) 920-0400
Fax: (317) 920-0404

Klint L. Bruno
KOREIN TILLERY LLC
205 N. Michigan Avenue, Suite 1940
Chicago, Illinois 60601
Direct: (312) 899-5065
Fax: (312) 641-9555

Eric H. Zagrans  (0013108)
ZAGRANS LAW FIRM LLC
474 Overbrook Road
Elyria, Ohio 44035
Phone: (440) 452-7100

Robert L. King
KOREIN TILLERY LLC
505 N. 7th Street, Suite 3600
St. Louis, Missouri 63101
Phone:  (314) 241-4844
Fax:  (314) 241-3525

*Attorneys for the Trustee of Leimkuehler,
Inc. Profit Sharing Plan*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that a copy of the foregoing was filed electronically on October 11, 2011.  Notice of this filing will be sent to the following parties by operation of the Courts electronic filing system.  Parties may access this filing through the Court's system:

Bart A. Karwath
Bart.karwath@btlaw.com
Dennis P. Stolle
dstolle@btlaw.com
Robert D. MacGill
rmacgill@btlaw.com
Barnes & Thornburg LLP

Eric S. Mattson
emattson@sidley.com
Joel S. Feldman
jfeldman@sidley.com
Sarah H. Newman
snewman@sidley.com
Sidley Austin LLP

*Counsel for Defendant*


   */s/ Kathleen A. DeLaney*
Kathleen A. DeLaney