UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ROBERT V. LEIMKUEHLER, as trustee and on    )
behalf of Leimkuehler, Inc., Profit Sharing    )
Plan,    )
    *Plaintiff,*    )
        )
    *vs.*    )    1:10-cv-0333-JMS-TAB
        )
AMERICAN UNITED LIFE INSURANCE COMPA-    )
NY,    )
    *Defendant.*

## ORDER

Presently before the Court in this action alleging breaches of fiduciary duty under the

Employee Retirement Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, is the Defendant

American United Life Insurance Company's ("AUL") motion for summary judgment. [Dkt.

127.]

# I.
## STANDARD OF REVIEW

A motion for summary judgment asks that the Court find that a trial based on the uncon-

troverted and admissible evidence is unnecessary because, as a matter of law, it would conclude

in the moving party's favor. *See* Fed. R. Civ. Pro. 56. To survive a motion for summary judg-

ment, the non-moving party must set forth specific, admissible evidence showing that there is a

material issue for trial. Fed. R. Civ. Pro. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).

As the current version Rule 56 makes clear, whether a party asserts that a fact is undis-

puted or genuinely disputed, the party must support the asserted fact by citing to particular parts

of the record, including depositions, documents, or affidavits. Fed. R. Civ. Pro. 56(c)(1)(A). A

party can also support a fact by showing that the materials cited do not establish the absence or

presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. Pro. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. Pro. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially the grant of summary judgment. Fed. R. Civ. Pro. 56(e).

The Court need only consider the cited materials, Fed. R. Civ. Pro. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson v. Cambridge Indus.*, 325 F.3d 892, 898 (7th Cir. 2003). Furthermore, reliance on the pleadings or conclusory statements backed by inadmissible evidence is insufficient to create an issue of material fact on summary judgment. *Id.* at 901.

The key inquiry is whether admissible evidence exists to support a plaintiff's claims or a defendant's affirmative defenses, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999). When conducting this inquiry, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial . . . against the moving party." *Celotex*, 477 U.S. at 330.

## II.
### BACKGROUND

Consistent with the applicable standard of review, the facts that follow are presented in the light most favorable to Plaintiff Robert V. Leimkuehler, who is the trustee of the

Leimkuehler, Inc., Profit Sharing Plan (the "Plan").  Unless otherwise stated, all factual disputes are resolved in favor of Mr. Leimkuehler.[1]

### A.  The Plan's Investments in AUL's Separate Account

In 2000, the Plan entered into a group variable annuity contract with AUL.  [Dkt. 128-11.]  Through it, AUL agreed to permit Plan participants to invest their assets "in" certain mutual funds through a "separate account" maintained with AUL, and to perform certain recordkeeping and other administrative services for the Plan.  [*See id.* § 1.15; dkt. 128-1 ¶3.]

The separate account is an account for trading mutual funds that is, for regulatory reasons, separate from AUL's other assets—hence the name "separate account."  [*See* dkt. 134-3 at 7.][2]  AUL divided the separate account into sub-accounts that correspond to the mutual funds that AUL offered to the Plan.  [*Id.*]  For example, the "Alger American Growth" investment account invests only in the "Alger American Growth" mutual fund.  [Dkt. 128-11 at 17.]  AUL's investment accounts are then unitized into "accumulation units," which correspond to the value of shares in the mutual fund and which AUL assigns to participants—from this Plan and others—who invest in the particular investment account.  [*Id.* at 22; dkt. 134-5 at 11.]  Thus, rather than buying "shares" in a mutual fund, participants buy investment units in an account in AUL's name, which in turn buys the shares in the fund, as disclosed in the group variable annuity con-

---

[1] Very few facts are actually in dispute, and no material ones.  Indeed, Mr. Leimkuehler argues that but for his pending class-certification motion, he would have filed a cross-motion for summary judgment on the issue of AUL's fiduciary status.  [Dkt. 136 at 23 n.11.]  At oral argument, the parties agreed that the Court could and should resolve the motion for summary judgment before turning to the motion for class certification.  [Dkt. 163 at 96, 111.]

[2] Insurance is a highly-regulated industry, for the benefit of policyholders.  State law explicitly contemplates allowing insurance companies to provide variable annuities, like the one at issue here, via a separate account—which are "not chargeable with liabilities arising out of any other business the [insurance] company may conduct...which has no specific relation to or dependence upon such account."  Ind. Code § 27-1-5-1 Class 1(c).  ERISA itself also contemplates the use of separate accounts.  *See* 29 C.F.R. § 2510.3-101(h)(1)(iii).

tract and its marketing materials. [*See* dkt. 128-11 134-3 at 7.] AUL calculates the daily values of the accumulation units on the basis of a contractually disclosed formula, which accounts for expenses associated with the mutual funds. [Dkt. 128-11 at §§ 5.3-5.4.]

## B. AUL's Selection of Share Classes

A mutual fund sells several classes of shares, which differ by the fees and expenses—termed "expense ratio"—that the mutual fund will charge against the fund's assets. [*See* dkt. 89 at 8; 134-3 at 11.] Although Plan participants control which mutual fund they want to "buy," via the separate-account procedure described above, [*see* dkt. 128-3 ¶5], AUL alone decides which share class that it will make available through the investment account, [dkt. 135-1 at 8]. It does not specifically disclose to the Plan, or its participants, the different share classes available or the one that it has selected. [*See* dkt. 134-2 at 35-36.]

AUL does not claim that it selects for inclusion in its 401(k) offerings the share class with the lowest expense ratio. Rather it claims, and Mr. Leimkuehler does not dispute, that it discloses the total expenses associated with the class of shares it has selected for each mutual fund, in other words, the bottom-line figure that participants who choose to invest in the fund must pay. [*See id.* at 36; 128-10 at 3; 128-16 ¶13. *See also* dkt. 163 at 29 ("MR. BRUNO: The trustee gets an annual investment report that discloses…the net expense of the investment…[T]he total number doesn't just include the fund expense ratio, but also includes the administrative charge…that AUL collects.").]

## C. "Revenue" or "Expense" Sharing

Most, but not all, of the mutual funds that AUL makes available to trustees like Mr. Leimkuehler engage in so-called "revenue," or perhaps more accurately "expense," sharing. [Dkt. 128-1 ¶13 (noting that the Vanguard funds do not pay revenue sharing); 134-3 at 13.] Un-

der that arrangement, mutual fund companies will remit a portion of the expense ratio charged against shares to entities like AUL that agree to invest in the mutual fund companies by letting 401(k) participants "buy" the shares. [Dkt. 128-9 at 4.] AUL's proffered justification for engaging in revenue sharing is that the revenue reflects the value AUL provides to the mutual fund for performing administrative services that the mutual fund would otherwise have to perform—and may not in fact want to perform, for example, keeping track of many small accounts. [Dkt. 128-16 ¶14.] While Mr. Leimkuehler does not dispute that at least some of the expenses that were shared with AUL offset some of the costs the Plan would have otherwise had to pay AUL, he argues, and AUL does not dispute, that the offset was not completely one-to-one over the period in question. [*See* dkt. 135-1.] AUL did not disclose the existence of, or amount to which it engaged in, revenue sharing to Mr. Leimkuehler. [Dkt. 135-3 at 8.] Indeed, Mr. Leimkuehler unearthed an internal AUL email in which AUL employees expressed "significant reservations about disclosing revenue sharing" to clients, like Mr. Leimkuehler. [Dkt. 134-6 at 2-3.] Among other reasons provided there, the author worried that disclosure would "only confuse[] the analysis of expenses—how the overall fund expense is split has no[] bearing on the total cost to the participants." [*Id.*]

### D. AUL's Universe of Mutual Funds

Trustees like Mr. Leimkuehler who choose to have their plans do business with AUL must choose from the limited universe of mutual funds that AUL makes available. In 2000, when Mr. Leimkuehler first contracted with AUL, it offered only thirty-four funds, a number that grew over time to 383 by 2010. [Dkt. 128-11 at 17; 128-18 at 15.] Other than mutual funds offered by Vanguard, [*see* dkt. 128-1 ¶13], AUL requires mutual fund companies who wish to do

business with AUL, and by extension with the 401(k) plans it services, to engage in some form of revenue sharing with AUL, [dkt. 134-2 at 20-21].

From the universe of funds that AUL potentially made available, Mr. Leimkuehler had the option to refine the choices and to select the specific funds that he wanted to offer to Plan participants as investment options. On at least two occasions, [dkt. 128-12; 128-14], Mr. Leimkuehler changed the mix of mutual funds made available for the Plan. He did so in consultation with his investment advisor, Mr. Mazzone. [Dkt. 128-6 at 7.]

On two occasions, AUL unilaterally, as permitted under the contract, substituted one fund that it offered for another: In 2000, it swapped S&P 500 funds, and in 2011, it swapped funds from Vanguard. [Dkt. 128-1 ¶13.]

### III.
### DISCUSSION

Mr. Leimkuehler has two remaining substantive ERISA claims against AUL.[3] The first arises under 29 U.S.C. § 1104(a)(1)(A), which requires a fiduciary of a plan to "discharge his duties with respect to [the] plan solely in the interest of the participants and beneficiaries and…for the exclusive purpose of…providing benefits to participants and their beneficiaries; and…defraying reasonable expenses of administering the plan." His second claim arises under 29 U.S.C. § 1106(b)(3), the so-called prohibited-transaction statute. That latter statute provides: "A fiduciary with respect to a plan shall not…receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." *Id.* Mr. Leimkuehler contends that AUL violated both those statutes through its undisclosed revenue sharing that did not result in a dollar-for-dollar credit against the Plan's ex-

---

[3] In a previous ruling on AUL's motion for judgment on the pleadings, the Court held that a third claim sought only injunctive relief and would "only survive in connection with the substantive claims" set forth above, and the Court dismissed a fourth claim. [Dkt. 63 at 24.]

penses payable to AUL.[4]  Through the present motion, AUL seeks to establish that it could not have violated the statutes because they only apply to a "fiduciary," and it was not a "fiduciary" with respect to the revenue sharing.

A person, including a corporation like AUL, 29 U.S.C. § 1002(9), can be a fiduciary under ERISA in three ways:

> [A] person is a fiduciary with respect to a plan to the extent
>
> (i)   he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,
>
> (ii)  he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or
>
> (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).  According to the U.S. Department of Labor (the "DOL"), which has ERISA rulemaking and enforcement authority, applying those provisions "requires an analysis of the types of functions performed and actions taken by the person on behalf of the plan to determine whether particular functions or actions are fiduciary in nature….[The application of the provisions] is inherently factual…."  U.S. D.O.L Opinion Letter 97-16A, 1997 ERISA LEXIS 17, *10-11 (May 22, 1997).  As the Court considers the potential applicability of each subsection of 29 U.S.C. § 1002(21)(A), the Court must and will adhere to the evidentiary record the parties have provided.

Before discussing the three subsections of 29 U.S.C. § 1002(21)(A), the Court must first discuss the "to the extent" limitation that appears in the main text of the section.

---

[4] The U.S. Department of Labor has promulgated a final rule that will go into effect in April 2012 that will generally require plan administrators to disclose revenue sharing, like that which AUL received in this action.  *See* 76 Fed. Reg. 42542 (July 19, 2011) (to be codified at 29 C.F.R. § 2550.408b-2).

**A.  How Does the "To the Extent" Limitation Apply to AUL?**

ERISA's inclusion of the "to the extent" limitation in its definition of "fiduciary" reflects a congressional desire to make "people…fiduciaries when they do certain things but…entitle[] [them] to act in their own interests when they do others." *Johnson v. Georgia-Pacific Corp.*, 19 F.3d 1184, 1188 (7th Cir. 1994) (citation omitted).  Accordingly, when evaluating alleged breaches of fiduciary duty, "the threshold question is…whether [the defendant] was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).

As Mr. Leimkuehler clarified at oral argument, his theory of the case is "share class, share class, share class."  [Dkt. 163 at 24.]  That is, when AUL chose which mutual fund share class to select for inclusion in its investment accounts, it did so on the basis of considerations of revenue-sharing implications, which it neither disclosed to the Plan nor specifically used to provide a dollar-for-dollar credit against the fees that the Plan paid directly to AUL.

Mr. Leimkuehler has argued that the to-the-extent limitation only applies to his claim under 29 U.S.C. § 1104(a)(1)(A) and not to his claim under 29 U.S.C. § 1106(b)(3).  In other words, if AUL is a fiduciary for one purpose then he asks the Court to find it a fiduciary for all purposes for the prohibited-transaction statute.  [*See* dkt. 136 at 38-41.]  The Court cannot do so. The Seventh Circuit has been clear that 29 U.S.C. § 1002(21), which is incorporated by reference into the prohibited transaction statute via its use of the term "fiduciary," 29 U.S.C. § 1106(b)(3), "does not make a person who is a fiduciary for one purpose a fiduciary for every purpose." *Johnson*, 19 F.3d at 1188.  Indeed, the only Seventh Circuit case that Mr. Leimkuehler has attempted to cite in support of that argument, *Leigh v. Engle*, 727 F.2d 113 (7th Cir. 1984), actually reinforces the importance of the focus on the to-the-extent limitation—the "key language in

the statutory definition," *id.* at 133. *See also id.* at 134 ("Because Engle and Libco were fiduciaries with respect to the selection and retention of the plan administrators, the issue here is not whether they were fiduciaries but instead whether their fiduciary duties extended to the Reliable Trust investments in Berkeley, OSI and Hickory.").[5]

In the analysis that follows, the Court will, therefore, evaluate AUL's potential fiduciary status through the lens of Mr. Leimkuehler's stated theory of the case: When AUL chose which mutual fund share class to select for inclusion in its investment accounts, it did so on the basis of considerations of revenue-sharing implications, which it neither disclosed to the Plan nor specifically used to provide a dollar-for-dollar credit against the fees that the Plan paid directly to AUL.

### B. Does AUL's Revenue Sharing Implicate "Authority or Control Respecting the Management or Disposition of Plan Assets" under 29 U.S.C. § 1002(21)(A)(i)?

As indicated above, 29 U.S.C. § 1002(21)(A)(i) makes a person a fiduciary "to the extent…[(1)] he exercises any discretionary authority or discretionary control respecting management of such plan or [(2)] exercises any authority or control respecting management or disposition of its assets." Because Mr. Leimkuehler does not argue that AUL had any discretionary authority or control over the management of the Plan, [*see* dkt. 136 at 20], the Court will only discuss the latter alternative. In so doing, the Court will first identify the Plan assets at issue and then consider the "extent" to which the evidence shows that the revenue-sharing at issue results from AUL's "exercise[] [of] any authority or control respecting [their] management or disposition."

---

[5] The language that Mr. Leimkuehler quotes in his brief—that the "*per se* rules of [29 U.S.C. § 1106(b)(3)] make much simpler the enforcement of ERISA's more general fiduciary duties," *id.* at 123 (citation omitted)—does nothing to advance his argument because it does not specify *when* a person is a fiduciary. That analysis is, of course, governed by 29 U.S.C. § 1002(21)(A), which includes the to-the-extent limitation.

### 1. The Plan Assets at Issue

Mr. Leimkuehler argues that AUL exercises authority or control respecting the management or disposition of two types of Plan assets: the accumulation units that Plan participants receive in exchange for their contributions and the separate accounts funded with participant contributions. [*See* dkt. 136 at 20-21.]

AUL does not dispute, [*see* dkt. 143 at 11-12], that both items are Plan assets under ERISA, *see also* 29 C.F.R. § 2510.3-101(h)(1)(iii) ("[W]hen a plan acquires or holds an interest in any of the following entities its assets include its investment and an undivided interest in each of the underlying assets of the entity…[a] separate account of an insurance company…."); *id.* § 2510.3-102(a)(1) ("[T]he assets of the plan include amounts…that a participant or beneficiary pays to an employer, or amounts that a participant has withheld from his wages by an employer, for contribution…to the plan….").

AUL does, however, argue that Mr. Leimkuehler may not rely on a fiduciary theory founded upon AUL's use of separate accounts, which in its view was never pleaded in the Complaint. [Dkt. 143 at 11.]

While AUL is correct that Mr. Leimkuehler generally may not use his response to the motion for summary judgment to constructively amend his Complaint, *e.g.*, *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 693 (7th Cir. 2010) (collecting cases), Mr. Leimkuehler is not attempting to do so. His Complaint referenced AUL's use of separate accounts. [*See* dkt. 1 ¶¶11, 15, 64.] AUL had notice that they may be, and now are, at issue on summary judgment. Accordingly, in the analysis that follows, the Court will consider 29 U.S.C. § 1002(21)(A)(i)'s applicability vis-à-vis both the money that AUL receives from the participants (plus any matching employer contributions) and the mutual fund shares that AUL maintains in the separate account.

### 2. The "Extent" to Which AUL "Exercis[es] any Authority or Control Respecting Management or Disposition of [Plan] Assets"

With respect to the remaining part of 29 U.S.C. § 1002(21)(A)(i), which makes a person a fiduciary "to the extent he exercises any authority or control respecting management or disposition of its assets," the parties dispute several aspects of the definition as it applies to AUL's revenue sharing. For analytical convenience, the Court will work backwards through the legal standards governing definition. It will then address the DOL's recent enforcement letter against AUL concerning the United Concrete Waukegan, Inc. 401(k) Retirement Plan (the "United Concrete letter"), [filed at dkt. 151-2], which Mr. Leimkuehler contends should significantly control the Court's analysis.

### a. "Any Authority or Control"

The parties dispute what "any authority or control" means. Specifically, AUL argues that the authority or control over the Plan's assets must be discretionary in nature to potentially come within the definition, thereby precluding instances in which AUL's authority or control is merely ministerial in nature—as when AUL carries out the Plan participants' instructions. [Dkt. 129 at 15.] By contrast, Mr. Leimkuehler argues that "any" authority or control means what it says, so even ministerial authority or control will suffice.

While Mr. Leimkuehler has identified several out-of-Circuit authorities that he claims support his interpretation of the statute, his authorities are not controlling here. The Seventh Circuit has, on multiple occasions, made clear that discretion lies at the heart of ERISA fiduciary status:

> A fiduciary is an agent who is required to treat his principal with utmost loyalty and care—treat him, indeed, as if the principal were himself. The reason for the duty is clearest when the agent has a broad discretion the exercise of which the principal cannot feasibly supervise, so that the principal is at the agent's mercy. The agent might be the lawyer, and the principal his client; or the agent might be

an investment adviser, and the principal an orphaned child.  If the agent has no discretion and the principal has a normal capacity for self-protection, ordinary contract principles should generally suffice.  *At all events, ERISA makes the existence of discretion a sine qua non of fiduciary duty.*  29 U.S.C. § 1002(21)(A).

*Pohl v. Nat'l Benefits Consultants*, 956 F.2d 126, 128-129 (7th Cir. 1992) (emphasis added and one citation omitted).  *Accord Hecker v. Deere & Co.* ("*Hecker I*"), 556 F.3d 575, 583 ("In order to find that they were 'functional fiduciaries,' we must look at whether either Fidelity Trust or Fidelity Research exercised discretionary authority  or control over the management of the Plans, the disposition of the Plans' assets, or the administration of the Plans.") *reh'g denied Hecker v. Deere & Co.* ("*Hecker II*") 569 F.3d 708 (7th Cir. 2009); *Baker v. Kingsley*, 387 F.3d 649, 660 (7th Cir. 2004) ("[A] person is deemed a fiduciary only 'to the extent' he or she exercises discretionary authority…."  (citation omitted)); *Midwest Cmty. Health Serv. v. Am. United Life Ins. Co.*, 255 F.3d 374, 376-377 (7th Cir. 2001) ("[B]ecause AUL had discretionary authority over the contract in its ability to amend the value of the contract, AUL is an ERISA fiduciary."  (collecting cases)).

In light of the relevant authority from the Seventh Circuit, the Court need not and will not discuss Mr. Leimkuehler's other authorities.  Until the Seventh Circuit or the Supreme Court hold otherwise—and he makes no argument that either has yet done so—AUL cannot be a fiduciary under 29 U.S.C. § 1002(21)(A)(i) if AUL exercised only non-discretionary authority and control respecting the management or disposition of the Plan's assets.

### b.  "Exercises" that Authority and Control

The parties also dispute what it means for a person to "exercise[] any authority or control respecting management or disposition of its assets."  29 U.S.C. § 1002(21)(A)(i).

Mr. Leimkuehler first argues that if a provider like AUL restricts the universe of mutual funds that the provider offers to plan sponsors to chose for inclusion in their plans, the provider

has exercised discretionary authority and control over how the plan can invest its assets. [*See* dkt. 136 at 26-32.] AUL maintains that *Hecker I*, an ERISA revenue-sharing case, forecloses Mr. Leimkuehler's argument.

AUL is correct. The Seventh Circuit suggested in *dicta* that plan sponsors can limit the selection of funds available to their plan participants without implicating "authority or control" over plan management or assets. *Id.* ("We see nothing in [ERISA] that requires plan fiduciaries to include any particular mix of investment vehicles in their plan. That is an issue, it seems to us, that bears more resemblance to the basic structuring of a Plan than to its day-to-day management. We therefore question whether Deere's decision to restrict the direct investment choices in its Plans to Fidelity Research funds is even a decision within Deere's fiduciary responsibilities.").[6] By implication, the Seventh Circuit should express the same skepticism when vendors like AUL restrict the products that they are willing to sell to plan sponsors.[7] Given Mr. Leimkuehler's inability to point to any Seventh Circuit or Supreme Court authority that would affirmatively approve his argument, [*see* dkt. 136 at 24-30], the Court will follow the Seventh Circuit's technically non-binding lead and reject it, *cf. Hendricks County Rural Electric Membership Corp. v. NLRB*, 627 F.2d 766, 768 n.1 (7th Cir. 1980) ("A dictum in a Supreme Court opinion may be

---

[6] Mr. Leimkuehler has argued that such a proposition is inconsistent with the DOL's official commentary of its regulations. [*See* dkt. 136 at 27 (discussing "footnote 27" in the Final Regulation Regarding Participant Directed Individual Account Plans (ERISA 404(c) Plans), 57 FR 46906-01).] The Seventh Circuit has obviously, though implicitly, concluded otherwise. Indeed, the Fifth Circuit has explicitly refused to give that particular commentary any weight. *See Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 311 (5th Cir. 2007).

[7] In its opinion denying rehearing, the Seventh Circuit stressed that the plaintiffs did not allege that the mutual funds that were included within the investment universe "were unsound or reckless….They argued…that the Plans were flawed because Deere decided to accept 'retail' fees and did not negotiate presumptively lower 'wholesale fees.'" *Hecker II*, 569 F.3d at 711. The Court notes that Mr. Leimkuehler here makes no argument that the mutual funds that AUL offered to him were in any way unsound investments.

brushed aside by the Supreme Court as dictum when the exact question is later presented, but it cannot be treated lightly by inferior federal courts until disavowed by the Supreme Court.").

Otherwise, under Mr. Leimkuehler's view of ERISA, entities like AUL would be forced to offer every mutual fund in the marketplace or face the increased costs—to be passed on to plan participants—that come with being a fiduciary. Both are unpalatable outcomes not required by the plain text of ERISA or binding precedent. *See Hecker II*, 569 F.3d at 711 (emphasizing that *Hecker I* was not meant to endorse the notion that "any Plan fiduciary can insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them" because such a strategy "would place an unreasonable burden on unsophisticated plan participants who do not have the resources to pre-screen investment alternatives."). And persuasive precedent from other jurisdictions likewise suggests the same. [*See* dkt. 143 at 4 (collecting out-of-Circuit cases holding that selecting a universe of funds to offer to a plan is not a fiduciary function).]

AUL does, however, concede—and the Court finds—that the requisite authority and control would be present when it exercises its contractual "right to eliminate the shares of any of the eligible Mutual Funds, Portfolios, or other entities and to substitute shares of, or interest in, another Mutual Fund, Portfolio, or another investment vehicle, for shares already purchased" by Plan Participants, [dkt. 128-11 at 6]. [*See* dkt. 129 at 19.]

While Mr. Leimkuehler contends that the failure to exercise a contractual power to substitute or delete mutual funds that participants have already "purchased" constitutes an exercise of authority of control, [*see* dkt. 136 at 30 (arguing that "[t]he act of limiting the universe is not something AUL does at one discrete point in time; it does so on a constant, ongoing basis.")], the

Court must reject that proposition. He was unable to cite to any Seventh Circuit or Supreme Court authority for that novel reading of what it means to "exercise[]" authority or control. *See American Heritage College Dictionary* (3d ed. 1997) (defining "to exercise" as "[t]o put into play or operation; employ"). Absent such authority, the Court finds that Congress was clear that affirmative action is required; omissions do not suffice. *Trs. of the Graphic Commun. Int'l Union v. Bjorkedal*, 516 F.3d 719, 733 (8th Cir. 2008) ("An act of omission fails to satisfy the requirement that the individual exercise discretionary authority over plan assets.").

Furthermore, again without citing any authority, Mr. Leimkuehler also argues that when 401(k) plan providers like AUL choose among share classes for inclusion in their pre-selected menu of options for plan sponsors, the providers are exercising authority and control for the purposes of 29 U.S.C. § 1002(21)(A)(i). But the Court agrees with AUL, [dkt. 143 at 5 n.2], that if a provider can limit the mutual funds it will offer to plan sponsors, it can likewise select to only deal with particular share classes.

In summary, under existing Seventh Circuit law, when a provider offers plan sponsors a pre-selected universe of mutual funds of pre-selected share classes that plan sponsors can choose to include in their plans or not, the provider is not exercising "authority or control respecting management or disposition of plan assets" under 29 U.S.C. § 1002(21)(A)(i). Providers do, however, exercise such authority and control when they unilaterally change the investment choices that participants have already made.

### c. The United Concrete Letter

After the briefing on summary judgment had been completed, Mr. Leimkuehler requested and received leave to file supplemental evidence concerning the DOL's United Concrete Letter. [*See* dkt. 152.] There, a DOL regional office sent a preliminary enforcement letter dated Sep-

tember 28, 2011, to AUL concerning an AUL offered 401(k) plan that is in all material respects the same as the one at issue here. [*See* dkt. 153-2 *to* -5.] The DOL had been investigating allegations that AUL had knowingly transferred certain plan assets directly to the plan sponsor, in violation of ERISA. [*See* dkt. 151-2 at 3.] According to the enforcement letter, AUL was prohibited from doing so not only because it was a "party in interest" to the plan under 29 U.S.C. § 1002(14)—a status not relevant to this motion—but also because AUL was a "fiduciary" under 29 U.S.C. 1002(21)(A)(i). The only reasoning that the United Concrete letter offered regarding the assertion of fiduciary status was that "AUL was responsible for the selection of investment options that were made available under the [contract] and for adding and deleting investment options available to the Plan." [Dkt. 151-2 at 2.] In Mr. Leimkuehler's view, the DOL's finding should likewise control here with respect to the issue of AUL's fiduciary status under 29 U.S.C. § 1002(21)(A)(i).

After having considered the letter, the Court does not find that it alters any of the legal conclusions above, for several reasons. First, and perhaps most importantly, the letter is only preliminary—a warning of possible litigation rather than a formal ruling of the DOL. Consequently, the letter is not subject to *Chevron* deference.[8] *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (citations omitted) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."). Second, it is essentially conclusory with respect to the fiduciary-status issue, which forms the heart of this action. As such, the letter does not provide the Court with reasoning that might help situate the letter within the contours of existing Circuit precedent. Finally, insofar as the DOL maintains that di-

---

[8] Like all agency documents, it is still "entitled to respectful consideration," *Carter v. AMC LLC*, 645 F.3d 840, 844 (7th Cir. 2011), which the Court has provided to it.

verting plan assets renders a person a fiduciary under 29 U.S.C. § 1002(21)(A)(i), the Court agrees, as did AUL at oral argument, because, as explained above, a diversion constitutes an exercise of discretion. In this action, however, Mr. Leimkuehler has presented neither argument nor evidence that AUL ever diverted assets from whether Plan participants directed that they be sent.

### 3. The Evidence Here

Mr. Leimkuehler presents two theories as to why AUL qualifies as a fiduciary under 29 U.S.C. § 1002(21)(A)(i). First, AUL "established, owns and controls the separate account and its 'investment accounts,' and AUL determines the value of investment account accumulation units." [Dkt. 136 at 2.] Second, "AUL selects and limits the investment options available to the Plan." [*Id.*]

### a. The Separate Accounts and Investment Accounts

With respect to the first theory, the undisputed evidence establishes that Mr. Leimkuehler is correct as a factual matter. AUL receives Plan contributions and places them in a separate account, held under AUL's own name, and then allocates the contributions into investment accounts according to the mutual fund that Plan participants choose to "buy." [*See, e.g.*, dkt, 128-11 at §§ 1.15, 9.1; dkt. 134-3 at 7.] AUL then determines the value of the accumulation units that participants receive according to a pre-determined, contractually disclosed formula. [Dkt. 128-11 at §§ 5.3-5.4.]

Except in two instances, which the Court will set aside for the moment, none of those activities render AUL a fiduciary under 29 U.S.C. § 1002(21)(A)(i) as a matter of law. While the separate accounts and investment accounts are Plan assets, the evidence does not show any exercise of discretion on AUL's part, meaning that AUL exercised none of the required "authority

and control." There is no evidence that AUL absconded with any Plan assets, that AUL provided accumulation units for one fund when the participants thought they were buying another, that AUL purchased a share class that resulted in higher expenses than the expenses disclosed to the participant, or that AUL failed to properly apply the valuation formula to the accumulation units—a ministerial calculation, *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 20 (1st Cir. 1998) ("Without more, mechanical administrative responsibilities (such as retaining the assets and keeping a record of their value) are insufficient to ground a claim of fiduciary status." (citations omitted)).

The narrow two exceptions, which ultimately do not create an issue of fact precluding summary judgment either, occurred when AUL unilaterally substituted one mutual fund that Plan participants had purchased for another. AUL did so in 2000, when it "substituted the SSGA 500 Fund for the Fidelity S&P 500 Fund." [Dkt. 128-1 ¶13.] The other occurred in 2011, when "AUL substituted the Vanguard Insurance Fund Small Company Growth Portfolio for the Vanguard Explorer Fund." [*Id.*] AUL argues, [*see* dkt. 129 at 20], and Mr. Leimkuehler does not dispute, [*see* dkt. 136], that any liability for the first substitution is barred by ERISA's statue of repose, 29 U.S.C. § 1113(1),[9] and that no liability under 29 U.S.C. § 1106(b)(3) can attach for the second because to the extent that AUL exercised control over the Plan assets involving Vanguard funds, neither Vanguard fund involved revenue sharing.

The Court, therefore, finds that AUL is entitled to summary judgment on Mr. Leimkuehler's first theory as to why AUL is a fiduciary under 29 U.S.C. § 1002(21)(A)(i).

---

[9] In connection with the pending motion for class certification, Mr. Leimkuehler briefly argued that no time limit was required for the class definition because of the potential for tolling. [*See* dkt. 122 at 47.] Given that neither Mr. Leimkuehler's papers on summary judgment, nor his oral argument, dispute the time-barred status of the 2000 substitution, the Court can forgo any further discussion of it. *See* Fed. R. Civ. Pro. 56(c)(3) ("The court need consider only the cited materials….").

### b.  The Menu of Mutual Funds

Mr. Leimkuehler also correctly argues that the undisputed evidence establishes that AUL limits the mutual funds that he may select for inclusion in the Plan.  In 2000, when Mr. Leimkuehler initially contracted with AUL, he understood and agreed that AUL's universe of mutual funds was limited to thirty four, which were disclosed.  [Dkt. 128-11 at 17.]  By 2010, that universe had grown to 383, [dkt. 128-18 at 15], still a small fraction of the thousands of funds available in the marketplace, *Hecker I*, 556 F.3d at 586.

As discussed above, however, merely limiting the universe of funds an entity will offer, and their share classes, do not render the entity a fiduciary under 29 U.S.C. § 1002(21)(A)(i). When AUL did so here, it did not exercise the requisite discretionary authority and control over the ultimate disposition of Plan assets because Plan participants ultimately decided for them-selves whether or not to invest in a particular mutual fund.  AUL merely followed their direc-tions.

### C. Does AUL's Revenue Sharing Implicate any "Investment Advice" Under 29 U.S.C. § 1002(21)(A)(ii)?

The definition of fiduciary under 29 U.S.C. § 1002(21)(A)(ii) contains several elements, but only one is ultimately relevant here:  the statutory requirement that the person "render[] in-vestment advice."  The other elements do not matter, and will not be discussed, because the Court finds that the evidentiary record fails to create an issue of fact about whether AUL ren-dered investment advice for the Plan.  It did not.

The DOL has promulgated a regulatory gloss for 29 U.S.C. § 1002(21)(A)(ii), which among other things, requires that the person "render[] advice to the plan as to the value of securi-ties or other property, or makes recommendation as to the advisability of investing in, purchas-ing, or selling securities or other property."  29 C.F.R. § 2510.3-21(c)(1)(i).  Only the second of

those alternatives—making a "recommendation as to the advisability of investing in, purchasing, or selling securities or other property"—is potentially at issue.  [*See* dkt. 136 at 34 (only arguing the second alternative).]

According to Mr. Leimkuehler, and confirmed at oral argument, the only "recommendation" that he claims AUL made about whether the Plan should purchase mutual funds was an implicit one:  By marketing a discrete menu of mutual funds that trustees like Mr. Leimkuehler could choose from, AUL was, in his view, implicitly recommending that the Plan buy those funds, as compared to all others.  [*See* dkt. 163 at 102.]  The Court must reject that claim, on both legal and factual grounds.

As a matter of law, simply offering a discrete menu of funds does not constitute investment advice here in the Seventh Circuit.  In *Hecker I*, the Seventh Circuit held that Fidelity Trust was not a fiduciary to the plan at issue even though it provided a "menu" of mutual funds that the plan sponsor could choose to include in the ERISA plan.  556 F.3d at 583.  If the implicit-recommendation-theory that Mr. Leimkuehler advances were correct, *Hecker I* would have been decided differently.

As a matter of fact, based on the uncontroverted evidence in the record, Mr. Leimkuehler's claim that AUL was providing implicit investment advice also fails.  From the beginning of the Plan's relationship with AUL, Mr. Leimkuehler used a third-party advisor, Marco Mazzone, "for advice [as] to what stocks and items should be in the plan…."  [Dkt. 128-6 at 7.]  Furthermore, the annual reports that AUL provided about the mutual funds that he could select for inclusion in the Plan had no evaluative commentary about the appropriateness of particular funds, instead presenting only information like expenses and historical return information, [*see* dkt. 134-12, 134-13, 138], information that the DOL has determined fall outside the scope

of investment advice, *see* 29 C.F.R. § 2509.96-1(d)1)(ii) (excluding from "investment advice" information about "investment alternatives under the plan (*e.g.*, descriptions of investment objectives and philosophies, risk and return characteristics, historical return information, or related prospectuses objectives and philosophies, risk and return characteristics, historical return information, or related prospectuses)." (footnote omitted)). Indeed, the Court notes that Mr. Leimkuehler's Statement of Material Facts in Dispute contains no assertion that Mr. Leimkuehler himself believed that AUL implicitly recommended the "advisability" of the mutual funds it had partnered with.

Accordingly, the Court finds that the uncontroverted evidence establishes that AUL is not a fiduciary under 29 U.S. § 1002(21)(A)(ii).

### D. Does AUL's Revenue Sharing Implicate any "Discretionary Authority or Discretionary Responsibility" in the Plan's Administration under 29 U.S.C. § 1002(21)(A)(iii)?

As previously indicated, § 1002(21)(A)(iii) requires that AUL have "discretionary authority or discretionary responsibility in the administration of [the] plan." Before the Court can decide whether the evidence would support such a finding, however, the Court must first address AUL's argument that Mr. Leimkuehler may not rely upon that theory because he did not timely disclose it.

### 1. Untimely Disclosure of § 1002(21)(A)(iii) as a Theory

Invoking cases holding that a party may not inject new claims into a case once it has reached summary judgment, *see, e.g.*, *Auston v. Schubnell*, 116 F.3d 251, 255 (7th Cir. 1997), AUL seeks to preclude Mr. Leimkuehler from relying upon § 1002(21)(A)(iii) in response to AUL's motion for summary judgment. [Dkt. 143 at 14.] As Mr. Leimkuehler freely concedes via surreply, he "did not plead this theory of fiduciary status in his complaint, and he did not de-

scribe it in his [contention] interrogatory answer," which merely objected to having to provide any contentions and referred AUL back to the Complaint. [Dkt. 146 at 1.]

AUL is right to criticize Mr. Leimkuehler for hiding the ball regarding this legal theory that he wished to pursue. No litigant in federal court should ever have to guess what claims or defenses are at issue. *See United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958) (explaining that liberal discovery under the Federal Rules was designed to make "trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent."). Had the Court been presented with Mr. Leimkuehler's objection to answering a contention interrogatory before it became at issue here, the Court would have overruled it and ordered him to answer based on what he knew at the time and supplement it later if discovery implicated additional theories. *See* Fed. R. Civ. Pro. 33(b)(2) ("An interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact…."); Fed. R. Civ. Pro. 26(e) (requiring parties to update their responses to discovery requests when new material information becomes available). *See also Ryan v. Mary Immaculate Queen Ctr.*, 188 F.3d 857, 860 (7th Cir. 1999) (explaining that, given the liberal notice-pleading standards in federal court, defendants should be able to pose contention interrogatories "at the outset of litigation, before costly discovery is undertaken").

Notwithstanding Mr. Leimkuehler's erroneous refusal to answer a legitimate contention interrogatory and failure to seek an appropriate amendment of his complaint, the Court will not preclude him from seeking to invoke § 1002(21)(A)(iii). He disclosed that fiduciary theory in his briefing on class certification, which predated AUL's motion for summary judgment. [*See* dkt. 122.] Consequently, AUL appropriately conceded at oral argument that it has suffered no prejudice from Mr. Leimkuehler's earlier nondisclosure. Absent prejudice to AUL from his mis-

step, Mr. Leimkuehler is entitled to be heard on the merits. Fed. R. Civ. Proc. 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."); *Hatmaker v. Memorial Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010).

### 2. Applying § 1002(21)(A)(iii)

Turning now to the merits of 29 U.S.C. § 1002(21)(A)(iii), Mr. Leimkuehler argues that because AUL has contractually reserved for itself multiple powers to unilaterally alter the Plan's administration, it "has…discretionary authority or discretionary responsibility in the administration of such plan," 29 U.S.C. § 1002(21)(A)(iii). Specifically, Mr. Liemkuehler cites, [dkt. 136 at 37-38], AUL's contractual rights to do the following as implicating discretionary authority in the Plan's administration:

- AUL's right "to make additions to, deletions from, substitution for, or combinations of, the securities that are held by the Investment Account," [dkt. 128-11 at § 3.3(a)];

- AUL's right "to eliminate the shares of any of the eligible Mutual Funds, Portfolios…if further investment in any or all eligible Mutual Funds…becomes inappropriate in view of the purposes of the contract," [*id.*];

- AUL's right "to transfer assets from any Investment Account to another separate account of AUL or Investment Account," [*id.* at § 3.3(b)]; and

- AUL's right to combine one or more Investment Accounts and [to] establish a committee, board or other group to manage one or more aspects of the Investment Accounts," [*id.* at § 3.3(c)].

AUL does not deny that those contractual rights implicate discretionary administration of the Plan. [*See* dkt. 143 at 14-15.]

AUL does, however, correctly argue that it is entitled to summary judgment because Mr. Leimkuehler has not demonstrated how any of that discretion implicates the selection of share classes, and resulting revenue sharing, alleged here. *See generally Chicago Bd. Options Exchange, Inc. v. Conn. Gen. Life Ins. Co.*, 713 F.2d 254, 259 (7th Cir. 1983) ("It is important to

remember that if Connecticut General is a fiduciary because of the power to amend [the contract], this status only governs actions taken in regard to amending the contract and does not impose fiduciary obligations upon Connecticut General when taking other actions."). For both 29 U.S.C. § 1104(a)(1)(A) and 29 U.S.C. § 1106(b)(3), the to-the-extent limitation inherent in the statutory definition of "fiduciary" precludes a finding that AUL was acting as a fiduciary with respect to the revenue sharing that took place here. Mr. Leimkuehler has introduced no evidence that AUL's used its discretionary administrative power—which he does not contend it ever used—to impact Plan participants' decisions about whether they wanted to invest in the mutual funds that Mr. Leimkuehler decided to make available to them, given the total expenses disclosed to them. Some participants chose to invest in Vanguard funds, which never paid revenue sharing. Others invested in funds that, unbeknownst to them, engaged in revenue sharing with AUL—a practice that, from this record, did not result in Plan participants paying more in expenses than was disclosed and which may, in fact, have ultimately reduced overall expenses of the Plan.

Accordingly, the Court finds that AUL is entitled to summary judgment as a matter of law that it could not have violated any of the claimed fiduciary duties that ERISA imposes. *See generally* Opinion 97-15A, 1997 ERISA LEXIS 18, at *10-11 (May 22, 1997) ("[I]t is generally the view of the Department that if a trustee acts pursuant to a direction…and does not exercise any authority or control to cause a plan to invest in a mutual fund, the mere receipt by the trustee of a fee or other compensation from the mutual fund in connection with the investment would not in and of itself violate section 406(b)(3)."); *Tibble v. Edison Intern.*, 639 F. Supp. 2d 1074, 1091 (C.D. Cal. 2009) (holding that where "decisions that resulted in the generation of…revenue sharing" did not arise from the exercise of the defendant's discretionary authority, the defendant

"cannot be a fiduciary with respect to those decisions, and therefore, cannot be liable for simply receiving the consideration from those transactions.").

**IV.**
**CONCLUSION**

In light of *Hecker*, 401(k) providers do not become fiduciaries merely by limiting the universe of mutual funds providers offer to 401(k) plans. Nor do they become fiduciaries merely by receiving shared revenue from those funds upon execution of plan participants' investment instructions to whom the total expense of the investment was accurately disclosed. *See Hecker*, 556 F.3d at 585 (rejecting "the proposition that there is something wrong, for ERISA purposes," with that type of arrangement). Given those legal propositions and the other Seventh Circuit authority governing the issues raised, Mr. Leimkuehler has failed to present evidence or argument that would enable him to prevail in this action. AUL's motion for summary judgment, [dkt. 127], is **GRANTED**.

01/05/2012

_Jane Magnus-Stinson_
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via CM/ECF:**

Klint L. Bruno
KOREIN TILLERY LLC
kbruno@koreintillery.com

Amanda C. Couture
DELANEY & DELANEY
acouture@delaneylaw.net

Edward O'Donnell DeLaney
DELANEY & DELANEY LLC
ed@delaneylaw.net

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

Joel S. Feldman
SIDLEY AUSTIN LLP
jfeldman@sidley.com

Bart A. Karwath
BARNES & THORNBURG LLP
bart.karwath@btlaw.com

Robert L. King
KOREIN TILLERY, LLC
rking@koreintillery.com

Robert D. MacGill
BARNES & THORNBURG LLP
rmacgill@btlaw.com

Eric S. Mattson
SIDLEY AUSTIN LLP
emattson@sidley.com

Sarah H. Newman
SIDLEY AUSTIN LLP
snewman@sidley.com

Dennis P. Stolle
BARNES & THORNBURG LLP
dstolle@btlaw.com

Eric Hyman Zagrans
eric@zagrans.com